OPINION
 

 KAPLAN, District Judge.
 

 Brand names — trademarks—are pervasive in modem business. Frequently, however, the business carried out under those marks is conducted by licensees pursuant to relationships in which the licensee benefits from the goodwill and consumer recognition of the licensed trademark while the licensor benefits from the capital investment and entrepreneurial skills of the licensee.
 

 A licensee often faces substantial risks in such a relationship, especially the risk that the licensee’s business will be so dependent upon the continued right to use the trademark that its very existence would be jeopardized by the expiration or termination of the license.
 
 [1]
 
 A rational licensee in such circumstances often will take steps to ensure the development of a
 
 *280
 
 business sufficiently independent of the licensed trademark to survive the end of the license. Whether the steps taken are consistent with the licensee’s obligations to the licensor or trademark owner and to the consuming public, however, frequently present close questions of policy and fact. This case presents just such questions.
 

 I
 

 Plaintiff E.G.L. Gem Lab Ltd. (“EGL Ltd.”) brought this action for trademark infringement and dilution, false designation of origin, unfair competition and breach of contract against Gem Quality Institute, Inc. (“GQI”) d/b/a European Gemological Laboratory and d/b/a EGL LA, Independent Gemological Laboratory, Inc. (“IGL”), Guy Margel, Thomas E. Tashey, Jr. and Myriam Tashey. GQI and the Tasheys counterclaimed against EGL Ltd. and Nachum Krasnianski, president and sole shareholder of EGL Ltd., alleging fraud and intentional interference with business relations and cross-claimed against Margel. The issues relating to Margel were settled before trial and the counterclaims against EGL Ltd. and Kras-nianski have been' abandoned. Plaintiff has consented to the dismissal of the claim against IGL.
 
 [2]
 
 The remainder of the case was tried to the Court. The following are the Court’s findings of fact and conclusions of law.
 

 A Gem Grading
 

 This case involves the small and tight-knit business of gem grading — the classification of precious stones, generally diamonds, according to certain characteristics. Gem grading laboratories examine and rate stones and issue certificates setting forth their findings. Those dealing in stones rely on such certificates as verifications of quality and, at least indirectly, value. Gem grading laboratories thus provide independent assessments frequently used in what otherwise often would be ill-informed purchase and sale decisions.
 

 Two sorts of gem grading are relevant to this case. Gem stones, particularly diamonds, are classified by cut, color, clarity and weight.
 
 [3]
 
 In addition, colored stones, including some diamonds, may be rated or graded with respect to color, although there are no universally accepted criteria for such color characterizations.
 
 [4]
 

 B. The EGL Network
 

 There is only a handful of prominent gem grading businesses in the world. Among the two leaders is European Gemological Laboratories, or EGL,
 
 [5]
 
 which was founded by Guy Margel when he opened the first EGL laboratory in Antwerp, Belgium, in 1974.
 
 [6]
 
 He then expanded quickly, opening a second laboratory three years later in New York, a third in Los Angeles in 1978,
 
 [7]
 
 and others in Israel, France and South Africa soon thereafter.
 
 [8]
 
 In 1980,he obtained federal registrations of the trademarks “European Gemological Laboratory” and “E.G.L.” in the name of European Gemological Laboratory, Inc. (“EGL Inc.”), a New York corporation of which he was the sole shareholder.
 
 [9]
 

 The protagonists in the current dispute, Nachum Krasnianski and Thomas Tashey, Jr., both were employees of Margel’s EGL operation. Krasnianski managed its New York laboratory. Tashey worked as a grader in the EGL Los Angeles laboratory for about fifteen months before leaving and, in 1980, starting his own Los Angeles
 
 *281
 
 operation with his wife, Myriam, under the name Independent Gem Lab.
 
 [10]
 

 1. Margel’s Sale of the U.S. EGL Business
 

 In the mid-1980’s, amidst a downturn in the international diamond market, Margel found his gem grading laboratories in some financial difficulty and so decided to spin off his U.S. operations while attempting to keep the network he had built intact.
 

 2. Margel’s Sale to Krasnianski
 

 In January 1986, EGL Inc. sold assets and its business to N.K. Gemological Services Inc., a company wholly owned by Krasnianski which thereupon changed its name to E.G.L. Gem Lab Ltd. (“EGL Ltd.”), the plaintiff in this case. As part of the transaction. EGL Ltd. acquired all of the U.S. EGL marks and granted to Mar-gel a “royalty free license to use the [EGL marks] in connection with the business of evaluating gems in the greater Los Ange-les, California area.”
 
 [11]
 

 3. The Sublicense to Tashey
 

 At or about the same time, Margel began negotiations with Tashey to grant him a sublicense to use the EGL marks in Los Angeles in return for royalty payments.
 

 On February 7, 1986, Margel’s counsel wrote to Tashey following a series of conversations. The letter confirmed that Tashey had been granted a license to use the EGL marks in the Los Angeles area, that Tashey would pay Margel a percentage of his gross income earned in connection with those marks, and that Tashey would “have
 
 no
 
 authority to do business in the name or on behalf of [EGL Inc.] or any other corporation of which Mr. Margel was or is a principal.”
 
 [12]
 
 It asked that Tashey sign and return a copy of the letter to signify his agreement.
 

 Tashey responded by expressing concern about the prohibition of his doing business in the name or on behalf of EGL Inc.:
 
 [13]
 

 “The use of the name for our company in promotion and advertising is essential to its value. We do not intend to hold ourselves out as agents, officers, or representatives of your client or his businesses, corporate or otherwise.”
 

 “In a recent phone conversation with Mr. Margel, he specifically indicated to me that
 
 he
 
 wished us to
 
 use the name in
 
 our business in the same manner as if we were connected to the California corporation and to the larger ‘EGL family’, rather than as a separate entity. We are attempting to comply with his requirements.”
 
 [14]
 

 Margel’s counsel promptly responded that Tashey’s letter had captured the intentions of the parties.
 
 [15]
 
 Upon his receipt of that communication. Tashey signed and returned the initial letter.
 
 [16]
 

 Tashey portrays the agreement thus reached as having done no more than given Tashey the right to use the EGL name.
 
 [17]
 
 But he takes much too narrow a view, colored substantially by his present self interest. It was in the mutual interest of Margel and Tashey that Tashey’s Los Angeles operation be viewed as part of the overall EGL operation, that it present itself to the public as before — as an EGL laboratory and part of the larger EGL network. As Margel testified, and as
 
 *282
 
 Tashey’s own letter suggests, Margel told Tashey that he was to operate only under the EGL name, and Tashey agreed.
 
 [18]
 
 Hence, Tashey undertook to operate the Los Angeles laboratory under the EGL name just as if it “were connected to the California corporation and to the larger ‘EGL family’, rather than as a separate entity.”
 
 [19]
 
 His agreement to do so was a material part of Margel’s inducement to grant the sublieense, as Margel intended the entire EGL network to continue to present itself as a single entity, despite the ownership changes in the United States, and he certainly would not have placed the EGL Los Angeles laboratory in the hands of a competitor.
 

 For a time, Tashey’s Los Angeles operation was uncontroversial. In 1991, however, a dispute over royalty payments
 
 [20]
 
 led Tashey and Margel to renegotiate the 1986 sublicense.
 
 [21]
 
 The new agreement, which became effective on December 30, 1991, resolved the economic dispute and confirmed the terms of the 1986 agreement but added a number of additional provisions that are relevant here. First, it extended the term of Tashey’s rights to December 31, 2001.
 
 [22]
 
 Second, it required Tashey to furnish Margel with samples of all promotional material, certificates, and other documents that used or referred to the EGL marks in any manner.
 
 [23]
 
 Finally, it proscribed any use of the EGL marks that would “impair or tend to impair [them] ... or the business reputation and goodwill associated therewith.”
 
 [24]
 

 The EGL business in the United States, to all outward appearances, continued as before for some time. As the foregoing indicates, however, the ownership situation actually was quite different. The U.S. business and marks were owned by Kras-nianski’s EGL Ltd. subject to the license for use of the marks in the Los Angeles area, which belonged to Tashey as a result of his sublicense from Margel. From an ownership perspective, Margel was out of the U.S. picture although he remained the licensee-sublicensor with respect to Los Angeles and retained the right to receive royalties from both Tashey and Krasnian-ski.
 

 C. The Expansion of Tashey’s Activities
 

 Tashey proved an aggressive and effective operator of the EGL business in Los Angeles. By 1993 or 1994, however, it had dawned on Tashey that a potential problem loomed. He successfully had invested a great deal of effort in promoting the EGL marks in Los Angeles, but his right to use the EGL name and marks would expire, absent a new agreement, at the end of 2001. He therefore was subject to the risk that Margel would refuse to renew the sublicense and that Margel. Krasnianski or someone else would open a gem grading business in Los Angeles under the EGL name.
 
 [25]
 

 Recognizing that all his eggs were in a single, fragile basket, Tashey first approached Krasnianski in the hope of buying the EGL U.S. business or marks.
 
 [26]
 
 In
 
 *283
 
 a letter dated September 27, 1998, he wrote:
 

 “Enclosed please find our two agreements made with Guy [Margel], along with your letter to Guy and the info we got from our lawyer concerning the EGL trademarks and their being ‘assigned’ to you.”
 

 “Please do consider what you would want to assign them to us and let us know — no hurry. We will certainly respect your desire to keep them or the New York lab — we just wanted to start discussions, and we are very concerned with what to do with Guy & the Antwerp lab.”
 
 [27]
 

 Krasnianski, however, rebuffed the overture.
 
 [28]
 
 So Tashey decided to build up a gem grading business of his own that could survive termination of the EGL subli-cense.
 
 [29]
 
 And this presented an appreciable business problem. EGL was one of the handful of recognized grading laboratories in the world, and Tashey to that point was not well known in the trade except, perhaps, as the director of EGL’s Los Angeles operation. As he admitted at trial, “it takes quite some time to establish identity, and it takes even more time to have people rely and depend upon a name and reputation of an entity in this type of business;”
 
 [30]
 
 being viewed as part of an international network of laboratories as opposed to a local laboratory is of substantial importance.
 
 [31]
 
 So Tashey — although he would have been free to terminate the EGL license and go into business for himself without the EGL marks
 
 [32]
 
 — ’instead decided to use the EGL marks to gain prominence and prestige for his own operation while at the same time paving the way for an eventual split between them.
 
 [33]
 

 1. Differentiation of EGL Los Angeles and Formation of GQI
 

 An essential feature of the plan was the establishment of an identity for the Tash-eys’ operation distinct from the rest of EGL and thus able to continue following any expiration of the right to use the EGL name.
 

 In July 1993, Tashey applied to the Patent and Trademark Office for registration of the mark “GQI,” which was an acronym for Gem Quality Institute.
 
 [34]
 
 In January 1994, he and his wife formed a California corporation called Gem Quality Institute, Inc. (“GQI”)
 
 [35]
 
 to serve as “the corporate parent” for the EGL laboratory in Los Angeles.
 
 [36]
 
 Tashey then began to use the name GQI prominently in a manner designed to associate GQI with EGL as the source of the services provided by the Tasheys’ Los Angeles operation. He intended that the GQI mark initially would draw strength from the association with EGL and, by 2001, be sufficiently distinctive and well known to leave Tashey with a valuable business even if he lost the right to use the EGL marks.
 
 [37]
 
 Once GQI was
 
 *284
 
 formed, he pursued this goal by a number of related means.
 

 2. Colored Stones
 

 As noted above, there is no universally accepted system for grading color stones or, more precisely, the color characteristics of stones. Historically, EGL labs have issued reports characterizing the color of diamonds although there have been no generally accepted standards, even among EGL labs, for doing so.
 
 [38]
 
 Although the evidence is less clear, it appears that they have not “graded” other types of gem stones for color although they have done much the same thing but called the process “identification” rather than grading.
 
 [39]
 

 When Tashey took over the EGL Los Angeles laboratory upon his procurement of the sublicense from Margel, he began-to issue reports on colored stones, including diamonds, under the EGL name, an activity he continued into 1994.
 
 [40]
 
 At or about that time, however, he began using a different method
 
 [41]
 
 for grading colored stones and began offering it only under the GQI name.
 
 [42]
 
 In a 1995 letter to clients, Tashey introduced the newly formed GQI as “the parent company of EGL-Los Angeles” and made clear that GQI — not EGL — would issue reports on colored stones, including diamonds.
 
 [43]
 
 Thus, while Tashey nominally continues to offer EGL colored stone identifications,
 
 [44]
 
 his promotional efforts with respect to colored stones have been devoted to GQI. Indeed, Tashey almost immediately began running advertisements for GQI’s colored stone grading services under the headline, “Not Every Choice Is Black and White,” which asserted that GQI had been created to fill a need for colored stone grading.
 
 [45]
 
 The logical inference, and the one drawn by the Court in the absence of credible evidence to the contrary,
 
 [46]
 
 is that Tashey’s efforts have resulted in the diversion of substantially all colored stone grading work from EGL Los Angeles to GQI.
 

 S. GQI Advertising and Promotion
 

 The effort to capture EGL goodwill for GQI while at the same time differentiating GQI in a manner that would permit Tash-ey to benefit from the EGL association, even after expiration of their EGL license, is quite clear in Tashey’s advertising and promotional efforts in and after 1994.
 

 Tashey advertised the GQI name extensively in printed media
 
 [47]
 
 and promotional letters to existing and potential customers,
 
 [48]
 
 by hosting receptions,
 
 [49]
 
 and by erecting a booth at trade shows marked prominently with the GQI name at which he graded stones and issued certificates under the EGL name.
 
 [50]
 
 In all of these
 
 *285
 
 endeavors, GQI was presented as closely affiliated with EGL. Several of the advertisements illustrate what Tashey was seeking to accomplish viz-a-viz the EGL and GQI marks.
 

 At least one trade publication ad, not to mention a number of other promotional pieces, identified the Tashey operation as “Gem Quality Institute, Inc. d/b/a EGL-LA” and used both the GQI and EGL logos with equal prominence, albeit with the words “Los Angeles” beneath that of EGL.
 
 [51]
 
 These characterizations thus suggested, as Tashey plainly intended, that EGL-LA was a creature of GQI and, in consequence, that the EGL services and quality with which customers were familiar were products of the same management as those offered by GQI.
 
 [52]
 
 Moreover, while the phrase “EGL-Los Angeles” is readily distinguished from “EGL” in the searing spotlight of litigation, it is quite likely that the significance of the reference to Los Angeles was not understood by very many readers of these ads. Indeed, there is significant anecdotal evidence of confusion.
 
 [53]
 
 At least an appreciable number of readers of these publications were misled into believing that the EGL network as a whole was a GQI operation or, at least, an affiliate.
 

 Tashey did not consistently present EGL as a GQI creation, however. On other occasions, he conveyed the thought that GQI and its colored stone activities were creatures of EGL — certainly an understandable objective given EGL’s prominence in the gem grading field. An advertisement Tashey first published in January 1994,
 
 [54]
 
 for example, stated: “E.G.L.-Los Angeles has created the Gem Quality Institute for your color stone grading needs. The same high quality services that you have grown to expect from E.G.L.-Los An-geles are the basis of this new and highly innovative company.” Again, readers familiar with EGL, especially outside Los Angeles, were likely to believe that the EGL network was responsible for creating GQI, which of course was not so.
 

 Tashey took advantage of the confusion between EGL and GQI to promote the GQI operation at EGL’s expense. Another advertisement that Tashey ran repeatedly from April 1995 through February 1998
 
 [55]
 
 portrayed GQI’s colored stone services as an alternative to those offered under the EGL name. The headline read: “You Have More than One Choice.” Beneath that legend appeared reprints of five advertisements or brochures of EGL and GQI.
 
 [56]
 
 Some of the reprints focused on diamond grading services of EGL Los An-geles or of EGL in general while the others dealt with the colored stone grading services of GQI. Beneath the reprints, the advertisement went on to state: “Two important services in one location that are changing the way the jewelry industry does business.” This statement was flanked on one side by “E.G.L. Los Ange-les” and the EGL logo and on the other by “Gem Quality Institute” and the GQI logo. Thus, Tashey used this advertisement to have GQI benefit from the association with EGL while at the same time establishing GQI as the source of a service — colored stone grading — different from the colored stone identification provided under the EGL name.
 

 
 *286
 
 While Tashey’s advertising was not always entirely consistent in its message concerning the precise nature of the claimed affiliation between EGL and GQI, some generalizations are clear. First, GQI almost always was presented as an affiliate of EGL in a clear effort to gain for GQI the identity and customer acceptance that EGL had built up over the years. Second, as Tashey admitted at trial, the degree of prominence that Tashey gave to GQI as compared to EGL in the advertising gradually increased over time.
 
 [57]
 

 Finally, the fig leaf upon which Tashey relied in doing so — the references to “EGL-Los Angeles” rather than simply to “EGL” — was ineffective. Customers and others in the trade for the most part either failed to notice the distinction or were confused by it. For example, customers mistakenly have sent payments to EGL-Los Angeles that were intended for EGL Ltd. in New York.
 
 [58]
 
 In 1997, EGL Ltd. was excluded as an exhibitor at the Southern Jewelry Travelers Association because GQI already had registered as EGL to exhibit there.
 
 [59]
 
 A Chicago real estate broker, upon hearing a rumor that EGL (i.e., Tashey) would open in that city, called Krasnianski to offer him space.
 
 [60]
 
 An Acmy acquaintance of Krasnianski told him that he had met Krasnianski’s “boss,” whom he understood to be Tashey’s wife.
 
 [61]
 
 Indeed, the existence of extensive confusion in the trade is readily inferred from the fact that Tashey felt compelled to make a speech at a trade show to address what he characterized as “rumors about our name change” — a reference to the increasing frequency with which his operation was referred to as GQI.
 
 [62]
 

 k- Trade Shows
 

 Trade shows also played an important role in Tashey’s efforts. In 1994, he began providing EGL-branded on-site diamond grading services at trade shows outside of Los Angeles
 
 [63]
 
 from a trade show booth that prominently bore the GQI name.
 
 [64]
 
 By so doing, he enhanced industry recognition of GQI, promoted its association with EGL, and competed for diamond grading business under the EGL name in geographic areas in which Krasnianski’s EGL Ltd. owned exclusive rights to the mark.
 

 5. Other Activities
 

 Tashey’s efforts to create a separate identity, and to have GQI free-ride on the back of EGL, were not limited to his advertising. Over time, his price lists first displayed only the EGL name and marks, then both EGL and GQI, and ultimately
 
 *287
 
 only GQI.
 
 [65]
 
 He began affixing a hologram with the GQI mark alone to EGL certificates.
 
 [66]
 

 6. The Chicago Operation
 

 In 1997, Tashey sought to increase his reach to Chicago. In April of that year, he and his wife signed a lease for office space in which to operate a gem grading laboratory under the name Gem Quality Institute, Inc. d/b/a European Gemological Laboratory.
 
 [67]
 
 When Margel declined to grant permission for use of the EGL marks in Chicago,
 
 [68]
 
 however, Tashey opened a full service laboratory solely under the GQI name. This was small comfort to Margel and Krasnianski for two reasons.
 

 First, although the Chicago operation held itself out only as GQI, letters to customers and press releases referred to EGL or its Los Angeles “branch.”
 
 [69]
 
 Tashey thus suggested an affiliation between EGL and the Chicago GQI business.
 

 Second, they found that the Chicago operation was competing against EGL Ltd. Prior to the opening of the Chicago GQI laboratory, Tashey graded white diamonds only under the EGL name,
 
 [70]
 
 as Tashey understood that he was prohibited from such activity under any other name by the Margel agreement. Over 90 percent of GQI’s business in Chicago, however, consists of grading white diamonds.
 
 [71]
 
 And Tashey conceded at trial that 30 to 40 percent of the Chicago business came from Los Angeles customers who presumably would have bought EGL certificates but for the availability of that service from GQI in Chicago.
 
 [72]
 
 Thus, a substantial part of the white diamond grading work previously done in Los Angeles under the EGL name has been shifted to GQI in Chicago. Moreover, there is credible evidence that at least some white diamond grading work has been diverted from EGL Ltd. in New York to the GQI Chicago operation.
 
 [73]
 

 7.
 
 Tashey’s Intent
 

 Thus, by 1998, Tashey had effectively used the EGL name to become a competitor under the GQI mark. He used the EGL name to establish GQI in the trade and to gain customer acceptance. He captured colored stone grading work in Los Angeles by presenting GQI as the EGL affiliate that performed that sort of work. He diverted white diamond grading business away from EGL to GQI’s Chicago operation. He positioned himself to continue in the gem grading business after the expiration of the EGL license. And he deliberately did all of this by creating a misleading impression as to the relationship between GQI and EGL.
 

 D. Tashey’s Other “Innovations”
 

 Two other so-called innovations introduced by Tashey are relevant here, although they go more to the consequences of the confusion he created rather than to the existence of confusion itself.
 

 
 *288
 
 First, in 1919, Marcel Tolkowsky defined the proportions of a round cut diamond which yield the greatest brilliance. His definition was adopted by the Gemological Institute of America. Consequently, a stone described as a Tolkowsky Cut is one which conforms, within narrow tolerances, to Tolkowsky’s definition.
 
 [74]
 
 Such stones are exceedingly rare.
 
 [75]
 

 Tashey’s Los Angeles EGL laboratory issues certificates describing stones as Tol-kowsky Cuts, but it does so even for stones that are cut in shapes other than round despite the fact that Tolkowsky’s definition applies only to round brilliant cut diamonds.
 
 [76]
 
 And it has stated, at different times, first that stones it so described conform to Tolkowsky’s tolerances and later to “our tolerances of those proposed by ... Tolkowsky” although Tolkowsky never defined any tolerances at all.
 
 [77]
 
 This has led to complaints in the trade of mislabeling that have reflected adversely on EGL.
 
 [78]
 

 Tashey also implemented a new clarity grade, SI3.
 
 [79]
 
 Clarity, which refers to the clearness or purity of a. diamond, is used along with cut, color, and weight to determine a diamond’s overall quality. The presence of blemishes, which are found on the surface of a diamond, or inclusions, which are internal impurities, can cause a diamond to receive a lower grade on the clarity grading scale, which ranges from flawless (FL) to imperfect (I1( I2, or I3), with grades such as very slightly included (VSi or VS2) or slightly included (SIlf SI2, or SI3) falling in between.
 
 [80]
 
 Tashey has described the SI3 grade as applying to stones that previously would have been graded as a low SI2, almost an I1; on the scale used by GIA that is standard to the industry.
 
 [81]
 
 In fact, however, as he admitted at trial, his SI3 grade covers not only the lower range of the GIA SI2 grade, but also part of the lower Ix grade.
 
 [82]
 
 This too misled customers and led to complaints.
 
 [83]
 

 E. The Responses of Margel and Krasni-anski
 

 Tashey’s activities did not go unnoticed by Krasnianski and Margel, although it is not always clear what each of them knew — apart from the general availability of Tashey’s ads in the trade press — and when he knew it.
 

 In late 1993, Margel obtained a copy of an ad or promotional piece which, he understood, Tashey intended to publish in February 1994.
 
 [84]
 
 The ad announced GQI as EGL’s “new color stone affiliate” and stated that “EGL introduces the GQI color stone grading system.” After consultation with Krasnianski, Margel had his counsel give notice of default to Tashey under the sublicense agreement as amended.
 
 [85]
 
 In addition to alleged defaults concerning payment and financial reporting, it complained that Tashey had failed to submit samples of all advertising materials to Margel as required and went on to state that:
 

 
 *289
 
 “the conduct of any business by you in the Los Angeles area, under whatever name and whether or not separately incorporated, that involves evaluating gems (whether diamonds or colored stones), and/or the taking of any steps in preparation or furtherance of any such business, except under and in compliance with the provisions of [the subli-cense] Agreement, is conduct that materially violates both the letter and the spirit of the last sentence of paragraph 4 thereof; it constitutes a material breach, from which you are required to desist.”
 
 [86]
 

 Tashey’s lawyer soon responded. He admitted that Tashey had not complied with the requirement that advertising be submitted to Margel, but sought to justify his actions by asserting that Tashey “assumed that [Margel] would discover such advertisements in the trade press” and contended that Margel had waived this provision of the agreement.
 
 [87]
 
 He took the position also that Tashey was in compliance with the sublicense, although he did not directly respond to the complaint about GQI.
 
 [88]
 

 Margel’s attorney in turn rejected the waiver contention and reiterated his position that Tashey was in breach of paragraph 4 of the sublicense agreement, obviously by virtue of his nascent GQI activities.
 
 [89]
 
 Tashey, however, repeatedly assured Margel that he would use GQI only for activities that did not compete with EGL and, perhaps equally important, threatened Margel with costly litigation in Los Angeles that Margel could not afford.
 
 [90]
 
 Concerned also that litigation with Tashey would undermine confidence in EGL and intermittently assuaged by false promises from Tashey that he would fix the problems of which Margel complained, Margel did not take legal action.
 
 [91]
 

 Krasnianski, perhaps, was more concerned about Tashey’s activities and persistently complained to Margel
 
 [92]
 
 on the premise that Margel, as the source of Tashey’s rights to the EGL name in Los Angeles, was obliged to deal with the problem.
 
 [93]
 
 His complaints to Margel became more insistent in late 1996,
 
 [94]
 
 when he demanded through counsel that the rights to the EGL mark in Los Angeles revert to him.
 
 [95]
 
 Before Krasnianski enforced this demand, however, matters between Mar-gel and Tashey came to a head over Tash-ey’s plan to open an EGL laboratory in Chicago.
 
 [96]
 

 Margel met with Tashey and his wife on June 2, 1997 at a Las Vegas trade show and made clear that they “could not go to Chicago and continue to do business as GQI d/b/a EGL.”
 
 [97]
 
 When the Tasheys continued to advertise their intention to do so, Margel fired off a ferocious fax in which he purported to “forbid” Tashey’s opening an EGL laboratory in Chicago or his accepting work there to be performed in Los Angeles.
 
 [98]
 
 Tashey then backed down to a modest degree, assuring Margel that he
 
 *290
 
 would not use the EGL name or issue diamond certificates in Chicago.
 
 [99]
 
 "
 

 At that point, Tashey’s actions and Mar-gel’s reluctance to cross swords with him strained KrasniansM’s patience to the breaking point. This action followed promptly in September 1997. EGL Ltd. here claims that Tashey has infringed its EGL marks, used false designations of origin in violation of the Lanham Act, engaged in unfair competition, diluted the EGL marks, breached its contract with Margel, and committed fraud on the Patent and Trademark Office in registering his GQI mark. Defendants dispute plaintiffs claims and contend also that plaintiff abandoned the EGL marks and lacks standing to assert a breach of contract and that its claims are barred by laches and unclean hands.
 
 [100]
 
 They have counterclaimed for fraud and intentional interference with business relations, although the counterclaims have been abandoned.
 
 [101]
 

 II
 

 The business problem that confronted Tashey is perfectly understandable. It was entirely reasonable for him to be concerned that he was devoting a great deal of effort to promoting a business, the chief asset of which — the right to use the EGL trademark — could disappear a few short years hence, and to consider how to secure greater benefits and security for himself. Had he chosen to pursue those goals by simply exercising his right to terminate the EGL sublicense and then set up GQI in competition with EGL, plaintiff would have had no ground for complaint. Indeed, if one for the sake of discussion were to put aside the contract between Tashey and Margel, the Court assumes that plaintiff would have had no legitimate grievance had Tashey continued to operate as EGL-Los Angeles and simultaneously set up GQI as a competitor to EGL, provided only that he did nothing to suggest any affiliation between the two. But that is not what occurred. Rather, Tashey decided to build up his own business by trading upon the reputation of EGL to benefit GQI. confusing the marketplace in the process, and to do so notwithstanding his contract with Margel. The fundamental question here, irrespective of which legal doctrine is brought to bear, is whether he crossed the line that separates appropriate from unfair and deceptive means of competition.
 

 EGL Ltd. first claims that the defendants infringed its marks in violation of Section 32(1) of. the Lanham Act
 
 [102]
 
 by using the registered EGL marks
 
 [103]
 
 (1)
 
 *291
 
 beyond the scope of the uses permitted by the sublicense, and (2) associating them with GQI in a manner that created confusion as to source, sponsorship and affiliation. It claims also that defendants violated Section 43(a) of the Act
 
 [104]
 
 by falsely designating the origin of the GQI and EGL services it offered in that it intentionally deceived consumers as to the association between EGL and GQI and as to the source of their services.
 

 A
 
 Alleged Abandonment of the EGL Ma,rks
 

 The registration of the EGL marks is
 
 prim,a facie
 
 evidence that they are protective,
 
 [105]
 
 and defendants do not contend otherwise.
 
 [106]
 
 Defendants nevertheless argue that the marks are invalid on the theory that EGL Ltd.’s license to Margel and Margel’s sublicense to Tashey each was “naked” — i.e., it did not provide for supervision or control of the licensed use sufficient to offer the requisite assurance of quality — and thus worked an abandonment of the marks. Plaintiff rejoins that defendants are estopped from taking this position by the doctrine of licensee estoppel, which provides that “a licensee who freely enters into a license and pays royalties or agrees to the limitations imposed by a licensor effectively recognizes that the li-censor possesses a valid trademark.”
 
 [107]
 
 Tashey responds that the doctrine of licensee estoppel is dead and that he is free to challenge the validity of the EGL marks.
 

 Licensee estoppel probably first gained prominence in the patent area, where pat-entees frequently argued that licensees were estopped to challenge the validity of licensed patents. As Tashey argues, in
 
 Lear, Inc. v.
 
 Adkins,
 
 [108]
 
 the Supreme Court rejected the doctrine as applied in the patent field. But his insistence that
 
 Lear
 
 should be applied to abrogate the doctrine of licensee estoppel in the trademark realm is misguided.
 

 The
 
 Lear
 
 Court dealt with the clash between the general principle of estoppel, viz. a party cannot repudiate its promises simply because it is dissatisfied with the bargain it struck, and the strong policy that all ideas in general circulation be dedicated to the common good unless protected by a valid patent.
 
 [109]
 
 It recognized that “the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain.”
 
 [110]
 
 Accordingly, the Court held that the public interest in free competition in the use of ideas was paramount and held licensee estoppel inapplicable in the patent area.
 

 The considerations in the trademark realm are quite different. Trademarks, unlike patents, do not confer legally protected monopolies on useful advances in science and technology in order to provide incentives for inventors. Rather, they protect the public against confusion among designations of products and services that serve a source-identifying purpose and “guard! ] against the depletion of the general vocabulary available for the description of articles in commerce.”
 
 [111]
 
 The public interest in promoting challenges to the validity of trademarks, if indeed there is any, therefore is not nearly as weighty as
 
 *292
 
 in the patent area. Accordingly, “courts have held that the
 
 Lear
 
 rule is not applicable to estoppel in trademark cases.”
 
 [112]
 
 This Court agrees.
 
 [113]
 
 Tashey therefore is precluded from contending that the EGL marks are invalid by virtue of his acceptance of a sublicense to use them.
 
 [114]
 

 B. Trademark Infringement and False Designation of Origin
 

 Section 32(1) of the Lanham Act in relevant part prohibits:
 

 “use in commerce [of] any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ....”
 
 [115]
 

 Section 43(a) prohibits the use of:
 

 “any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin ... likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association ... with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person »
 
 [116]
 

 It therefore, among other things, protects unregistered marks in much the same way as Section 32(1) protects registered marks.
 

 Notwithstanding the differences in wording, the standards applicable under both statutes are substantially the same. In order to prevail, a plaintiff must demonstrate the existence of a valid mark and that the defendant’s actions are likely to confuse “an appreciable number of ordinarily prudent purchasers ....”
 
 [117]
 
 The likely confusion may relate to the source of the product or service or to affiliation with or sponsorship of the alleged infringer by the trademark owner.
 
 [118]
 
 In determining likelihood of confusion, the Court applies the familiar
 
 Polaroid
 
 factors: (1) strength
 
 *293
 
 of the senior user’s mark, (2) degree of similarity between the marks, (3) proximity of the products, (4) likelihood that the senior user will bridge the gap, (5) evidence of actual confusion, (6) defendant’s bad faith, (7) quality of defendant’s products, and (8) sophistication of the relevant consumer group.
 
 [119]
 

 EGL and European Gemological Laboratory are registered marks infringement of which violates Section 32(1) of the Lan-ham Act. Their registration certificates are
 
 prima facie
 
 evidence of their protectibility; indeed, they concededly are incontestable.
 
 [120]
 
 Defendants concede, and in any case are estopped to deny, the protectibility of the other EGL marks.
 
 [121]
 
 Accordingly, the only issue in controversy is likelihood of confusion.
 

 1. Use Outside the Los Angeles Area
 

 Tashey’s use of the EGL name and marks in connection with his grading of stones and issuance of EGL certificates at trade shows outside the Los Angeles area manifestly violated the terms of his sublicense. While he sought at trial to justify his actions by characterizing this activity as promotional, his explanation was not credible
 
 [122]
 
 and, in any case, would not have been sufficient. The simple fact is that he was engaged in attempting to divert customers desirous of EGL grading services and certificates away from EGL Ltd. in parts of the country in which EGL Ltd. had retained exclusive rights to the name and marks.
 

 The question whether this behavior infringed EGL Ltd.’s marks is equally straightforward. It often has been said that “[a]ny sales of goods or services under the [licensed] mark which are outside the area of consent granted in the license are regarded as infringements of the mark.”
 
 [123]
 
 Just as the unauthorized use of a mark by a former licensee “constitutes a fraud on the public, since they are led to think that the ex-licensee is still connected with the licensor,”
 
 [124]
 
 the use of a licensed mark beyond the scope of the license may deceive the public into thinking that the licensee is authorized to provide the goods or services offered under the mark when in truth it is not. Hence, Tashey’s grading of stones under the EGL name and issuance of EGL certificates outside the Los Angeles area infringed plaintiffs marks.
 
 [125]
 

 
 *294
 

 2. Other Forms of Infringement
 

 EGL Ltd. asserts next that defendants’ use of the EGL marks in conjunction with GQI services causes two distinct types of confusion. The first is confusion in the traditional sense — the public allegedly is misled into thinking that the junior user’s goods or services are those of the senior user.
 
 [126]
 
 This occurs, plaintiff contends, when Tashey advertises GQI’s colored stone grading services, for example, in a manner that suggests that they were developed by or somehow are provided under EGL’s auspices. The second type of alleged infringement is the use of the EGL name and marks in a manner that suggests that GQI is the source of the products and services offered by EGL — for example, advertisements indicating that GQI is the ultimate source of EGL products or services. In other words, plaintiff complains of a form of reverse confusion— “that consumers are likely to assume mistakenly that the subsequent user of the mark ... is the source of the goods and services of the senior user.”
 
 [127]
 

 a. Conventional Confusion
 

 Any number of Tashey’s actions are attacked as likely causes of traditional confusion. For example, among the disputed advertisements is that depicted below:
 

 
 *295
 
 [[Image here]]
 

 Plaintiffs point is that this advertisement created the impression that products and services offered by GQI were in fact offerings of or approved by EGL, notwithstanding the reference to EGL-Los Angeles, as did a host of other less explicit advertisements published and activities undertaken by Tashey since 1994.
 
 [128]
 

 The
 
 Polaroid
 
 factors strongly support plaintiffs contention. The evidence clearly demonstrates that EGL is a strong mark, as it is widely recognized by independent sources as one of the two or perhaps three leading gem grading laboratories in the world.
 
 [129]
 
 The proximity of the products is exceptionally close, as the diamond certificates Tashey offers in Chicago are essentially identical to those offered by EGL and the colored stone certificates he offers in Los Angeles are very similar to the colored stone identifications done by EGL. As noted earlier, there is evidence of actual confusion.
 
 [130]
 
 Although the relevant consumer group appears to be relatively sophisticated, the fact that Tashey felt it necessary to attempt to dispel confusion concerning what he euphemistically referred to in a trade show speech as rumors of a change in the name of his business demonstrates that the sophistication of the audience is insufficient to avoid confusion here. Tashey’s misleading use of the Tol-kowsky designation and SI3 grade entailed the provision of lower quality services. But perhaps the most important of the
 
 Polaroid
 
 factors is Tashey’s manifest bad faith.
 

 An inference of confusion is justified where the alleged infringer acts with intent to cause confusion or to deceive.
 
 [131]
 
 That is precisely the case here. Tashey recognized that the development of a commercially valuable identity and reputation for his own business, as opposed to the business he ran under the EGL sublicense, would “take[] quite some time.”
 
 [132]
 
 He decided to shortcut that process by associating his new identity, GQI, with EGL in a
 
 *296
 
 manner that in some cases falsely stated, and in other cases falsely implied, that EGL was the progenitor of GQI and its products.
 
 [133]
 

 While the foregoing strongly supports a finding of confusion, it remains to consider whether either the sublicense of the EGL marks or Tashey’s use of the phrase “Los Angeles” in connection with EGL is sufficient to avoid this conclusion.
 

 “[A] product may ... have multiple marks owned by different firms.”
 
 [134]
 
 For example, one mark might belong to identify the manufacturer while a second might be that of the distributor.
 
 [135]
 
 And this raises no concern “so long as the effect [of using multiple marks of different owners] upon customers and prospective customers is not to confuse them as to the source of the goods or to obliterate the distinction between the distributor and the manufacturer” or other owners of the respective marks.
 
 [136]
 
 Thus, while the sublicense gave Tashey the right to use the EGL name and marks, it did not privilege him to use them in conjunction with his own GQI mark in a manner that would confuse the relevant public as to the source of his products and services or the affiliation between GQI and EGL or enable him to reap for GQI the benefit of EGL’s good will.
 
 [137]
 

 Invicta Plastics (USA) Ltd. v. Mego Corp.
 

 [138]
 

 supports this conclusion. The plaintiff and the defendant there competed in the sale of certain games, the plaintiff’s being called “Mastermind” and the defendant’s “Sixth Sense.” Defendant used the word “Mastermind” nine times on each “Sixth Sense” package, indicating among other things that “Sixth Sense” had been
 
 *297
 
 created by the inventor of “Mastermind.”
 
 [139]
 
 Although the court acknowledged that defendant had the right, even absent a license, to make truthful references to the plaintiffs trademark, it nevertheless found the defendant liable for trademark infringement and false designation of origin because the manner in which the defendant used “Mastermind” on its “Sixth Sense” packages would confuse consumers into believing that the plaintiff was the producer of defendant’s product and because the defendant “was deliberately seeking to use the goodwill plaintiff ... acquired in its success with Mastermind to sell its own product.”
 
 [140]
 
 So too here.
 

 The addition of the words “Los Angeles” affords Tashey no greater comfort. Even viewing that addition in a light overly favorable to Tashey, it in substance was a disclaimer conveying the message that EGL Los Angeles was somehow different from other EGL operations. But one seeking to avoid a finding of likely confusion on the basis of a disclaimer bears the burden of demonstrating that the disclaimer was or is likely to be effective.
 
 [141]
 
 It follows that Tashey bore the burden of demonstrating that the addition of “Los Angeles” avoided confusing an appreciable number of persons, a burden he did not sustain. In any case, Tashey never effectively explained to his audience whether or how EGL Los Angeles differed from EGL. His Los Angeles operation offered essentially the same EGL certificates as did other EGL laboratories. Hence, even considered without regard to whether the onus of proof lay with Tashey or with plaintiff, the Court finds that the addition of the words “Los Angeles” did not significantly mitigate the confusion caused by Tashey’s association of the EGL mark with GQI. '
 

 For all of the foregoing reasons, the Court finds that Tashey’s use of the EGL name and mark in association with the GQI name and mark in fact confused an appreciable number of the relevant public as to the source of GQI’s products and services and as to the affiliation or sponsorship between GQI and EGL.
 

 b. Reverse Confusion
 

 As noted previously, at least one other Tashey advertisement falsely stated or suggested that GQI was the ultimate source of EGL products and services, a direct contradiction of the materials referred to in the preceding section. Exhibit 192, reproduced below, related that GQI did business as EGL:
 

 
 *298
 
 [[Image here]]
 

 Very much the same considerations discussed above yield the finding that this use too created confusion as to the source of EGL’s products and services and as to the association between GQI and EGL. Certainly the intent of this advertisement was to promote GQI by suggesting that it was the parent company of EGL Los Angeles and, in view of the ambiguity of the reference to Los Angeles, of EGL in general for the purpose of quickly building GQI’s reputation. The preceding discussion of the other
 
 Polaroid
 
 factors is fully applicable here as are the treatments of the use of multiple trademarks and the “Los Ange-les” “disclaimer.” Accordingly, the Court finds that this advertisement too created reverse confusion in the minds of an appreciable number of those who saw it.
 

 S. Conclusion
 

 As a matter of the law of trademarks, and without regard to his contractual obligations, Tashey had every right to start the GQI business and seek to develop the GQI name and mark. What he did not have the right to do was to intermingle the EGL name and marks with them in a manner likely to confuse the public as to the source of the products of either GQI or EGL or as to the connection between them. Yet he set out to do precisely that, and he succeeded. He plainly violated Sections 32(1) and 43(a) of the Lanham Act.
 

 C. Other Claims
 

 Plaintiff advances several other related theories, including unfair competition, trademark dilution, and alleged violation of Section 5 of the Lanham Act.
 
 [142]
 
 As none of those theories, if established, would entitle plaintiff to greater relief than that appropriate on the Lanham Act and contract claims, there is no need to consider them.
 

 Ill
 

 Plaintiff next claims that the Tashey defendants breached their contract with Margel in a number of respects, but two are of overriding importance. First, it maintains that Tashey was obliged by the contract to conduct his entire gem grading business under the EGL name and that the use of GQI in association with EGL
 
 *299
 
 therefore breached the agreement. Equally important, it asserts that Tashey’s use of GQI to compete with EGL Ltd. — by diverting colored stone grading business, by grading stones at trade shows, and by setting up the Chicago operation in competition with it — was inconsistent with his contractual obligations. Before reaching the substantive questions, however, it first must be determined whether EGL Ltd., which was not a party to the Tashey-Margel contract, may sue for its breach.
 

 A. Third-Party Beneficiary
 

 Under New York law, only an intended beneficiary of a contract may assert a claim as a third-party beneficiary.
 
 [143]
 
 A third party is an intended beneficiary where either (1) “no one other than the third party can recover if the promisor breaches the contract”
 
 [144]
 
 or (2) “the language of the contract otherwise clearly evidences an intent to permit enforcement by the third party.”
 
 [145]
 

 EGL Ltd. manifestly does not qualify as an intended third-party beneficiary under the first prong of the test. Margel obviously had the right to sue for breach. EGL Ltd. therefore is not the only party that may recover for breaches of the contract.
 

 Plaintiffs more substantial argument is that the contract “otherwise clearly evidences an intent to permit enforcement by [EGL Ltd.],”
 
 [146]
 
 a requirement satisfied by a showing that the contracting parties intended to benefit the putative third-party beneficiary.
 
 [147]
 
 In considering that argument, moreover, it is important to recognize the relevant characteristics of the law of trademarks and trademark licensing.
 

 A trademark is, essentially, a designation of origin.
 
 [148]
 
 It serves to inform the public of the source of the goods or services with which it is used. As the public comes to know the mark, it relies upon it as a sign that the goods or services sold under it are of the same quality as those that it has purchased from that source before.
 
 [149]
 
 This public association between a trademark and goods or services of a certain quality benefits the owner of the mark by making it easy for consumers to find its product. It benefits consumers by allowing them more easily to find goods or services of a particular producer that have given them satisfaction in the past.
 
 [150]
 

 
 *300
 
 These characteristics have led the law to treat trademarks differently from other species of property. Because the value of a trademark arises from its association with goods or services of a particular quality and source, a trademark comes into existence only once it is affixed to goods or services in commerce.
 
 [151]
 
 A trademark may be transferred only in connection with the business to which it relates,
 
 [152]
 
 as the mark otherwise would cease to signify the source and quality of the goods or services to which it once related and thus confuse the public.
 
 [153]
 

 These considerations have shaped the law of trademark- licensing. Although trademarks could not be licensed at common law because a mark was regarded as indicating “solely the physical source or origin of the product or service with which the trademark was used.”
 
 [154]
 
 the modern view is that licensing is permissible provided the licensor retains some degree of control over the quality of the goods or services marketed thereunder.
 
 [155]
 
 Indeed, it now is clear that a trademark may be acquired and sustained solely through use by a licensee, provided the licensor exercises the requisite degree of control, as the use of the mark by the licensee inures to the benefit of the licensor.
 
 [156]
 

 The context in which trademark licenses are created is defined in significant part by these realities. A licensor must exercise some degree of supervision over the licensee on pain of abandonment of the mark,
 
 [157]
 
 a result that never is in the licensor’s and rarely in the licensee’s interest. The reasonable licensee therefore understands that it is subject to such oversight. So too the licensee is bound to know that its use and promotion of the licensed mark gives the licensee no rights in the mark; its efforts inure to the benefit of the owner.
 
 [158]
 
 Indeed, a licensee that wishes to create rights in a mark separate from the licensed mark has an affirmative obligation to choose a mark sufficiently different from the licensed mark to avoid confusion — “[t]he licensee trades upon the good will of the licensor at the licensee’s per-JJ
 
 ”
 

 [159]
 

 There is one other aspect of the law of trademarks that is relevant here. A trademark is territorial.
 
 [160]
 
 It “exists in each country solely according to that particular country’s statutory scheme” and “ ‘is independent of the continued validity of its registration abroad, and its duration, validity, and transfer in the United States are governed by’ ” U.S. law.
 
 [161]
 
 Hence,
 
 *301
 
 although Margel founded the entire EGL network and still regards himself as its proprietor throughout the world, his self image is not consistent with the legal situation in the United States. Once he sold the New York laboratory and assigned all of the U.S. EGL trademarks to EGL Ltd., Margel’s only legal interest in them has been as a licensee of EGL Ltd. for Los Angeles. Thus, EGL Ltd. owns all U.S. rights in the name and marks subject to the Margel license and the limited rights that Margel sublicensed to Tashey.
 

 Against this background, the question whether the Margel-Tashey sublicense was intended to benefit EGL Ltd. and, if so, to what extent comes into sharp focus. The Tashey-Margel contract provided,
 
 inter alia,
 
 for royalty payments to Margel based on Tashey’s business derived from use of the EGL marks. To that extent, the agreement was intended to benefit only Margel. Certainly EGL Ltd. could not complain of a failure by Tashey to pay royalties to Margel. But that was not the only or, indeed, the relevant term of the contract.
 

 The sublicense granted Tashey the right to use the EGL marks in Los Angeles. The grant, however, was narrowly circumscribed. Tashey was (1) proscribed from using the marks outside of Los Angeles, (2) obliged to provide Margel with samples of literature, stationery, certificates, and advertising material,
 
 [162]
 
 (3) prohibited from doing anything that would impair the marks or the goodwill associated with them,
 
 [163]
 
 and (4) obliged to hold his business out as EGL. And these limitations were not for Margel’s sole or, in most cases, even principal benefit.
 

 The purpose of the territorial restriction was twofold. It reflected, of course, an acknowledgment by Margel that he lacked authority to grant a broader license. But the fundamental point was to protect the trademark owner from competition under its own name and trademark.
 

 The requirements that Tashey abstain from conduct that would impair the marks or then- goodwill and that he hold his business out as EGL of course benefitted both Margel and EGL Ltd., as both had interests in reinforcing the image of a strong, worldwide EGL network.
 
 [164]
 
 In view of the territorial nature of trademarks, however, EGL Ltd. — as the owner of the name and marks throughout the United States — had a more immediate interest than Margel, as EGL Ltd. was more likely to be injured by any breach by Tashey.
 

 Finally, the requirement that Tashey submit samples of his literature, certificates and advertising to Margel served the mutual interest of Margel and EGL Ltd. in seeing that EGL was presented to the public and delivered services in a uniform way. Again, however, EGL Ltd. was the more immediate beneficiary in view of its ownership of the EGL rights throughout the United States.
 

 But there is more to the point than simply the fact that EGL Ltd. derived as much or more benefit from these particular covenants than Mar-gel. As a licensee of EGL Ltd., Mar-gel had obligations to EGL Ltd. as the owner of the licensed trademark. He was obliged to act in good faith and was prohibited from depriving EGL Ltd. indirectly of the benefit of its bargain.
 
 [165]
 
 In other words, he was obliged
 
 *302
 
 to protect the name and marks. Hence, in extracting these commitments from Tash-ey, Margel was discharging his obligations to EGL Ltd.
 

 The Second Circuit has made clear its view that New York follows the Restatement formulation in determining when contracting parties intend to benefit a third party and thus to give that third party the right to enforce the contract.
 
 [166]
 
 In relevant part, the Restatement provides as follows:
 

 “(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either”
 

 “(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or “(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.”
 
 [167]
 

 Here there is little doubt that recognition of a right to performance in EGL Ltd. of those of Tashey’s undertakings as benefit-ted it by protecting its name and marks would be appropriate to effectuate the intention of the parties. In view of the fact that the relevant provisions of the subli-cense in some cases benefit EGL Ltd. alone and in others benefit it to at least as great an extent as they benefit Margel, the Court finds that Margel, the promisee, intended to give EGL Ltd. the benefit of those undertakings by Tashey.
 
 [168]
 

 This analysis draws support from
 
 Franchised Stores of N.Y., Inc. v. Winter.
 

 [169]
 

 The Court of Appeals there reasoned that a trademark owner has “an affirmative duty” to control its licensees on. pain of abandonment of the mark and, in consequence, that it must be permitted to sue an existing licensee for trademark infringement in otherwise appropriate circumstances.
 
 [170]
 
 It is no stretch to say that the same affirmative duty shapes the intentions and expectations of licensors and licensees and that the trademark owner, absent clear indications to the contrary, must be recognized as an intended beneficiary of sublicense provisions that protect the owner’s mark.
 
 [171]
 
 Accordingly, the Court finds that the relevant provisions of the Margel-Tashey contract were intended to benéfit EGL Ltd.,
 
 [172]
 
 which therefore may sue for their breach.
 

 Even if Margel and Tashey did not intend to benefit EGL Ltd., the Court finds that Krasnianski reasonably relied on promises made by Tashey, as the sublicen-see, to Margel, as the licensee/sublicensor, that Tashey would protect the integrity of the mark. Where reliance by the benefi
 
 *303
 
 ciary is both “reasonable” and “probable,” and particularly in cases where there exists an overriding policy embodied by statute, there may be a right in the beneficiary without regard to the intention of the parties.
 
 [173]
 
 The Court finds this to be such a case, especially in light of the protection afforded registered trademarks under the Lanham Act, and concludes that Krasnian-ski reasonably relied on Tashey’s promises to Margel that he would protect the business reputation and goodwill associated with the EGL marks.
 
 [174]
 

 B. The Substantive Contract Claims
 

 1. Failure to Operate Only Under EGL Name
 

 EGL Ltd. first contends that Tashey breached the agreement with Margel by conducting aspects of his gem grading business under a name other than EGL, namely under GQI. That of course requires determination of precisely what the contract provided.
 

 The written sublicense did not in terms require that Tashey hold his gem operations out exclusively as EGL. And if that writing were a complete and unambiguous integration of the agreement between Tashey and Margel, the parol evidence rule would preclude consideration of extrinsic evidence to vary, contradict, add to, or explain its terms.
 
 [175]
 
 But if the writing “was not intended to embody the entire agreement between the parties,” parol evidence would be admissible to prove the terms of the agreement.
 
 [176]
 
 The burden of establishing that the writing is a complete integration of the agreement lies on the party seeking to exclude parol evidence, in this case Tashey.
 
 [177]
 

 Neither the 1986 sublicense nor the 1991 amendment contained an integration clause, i.e., a specific provision stating in substance that the document embodies the entire agreement of the parties. In consequence, “the court must determine whether or not there is an integration ‘by reading the writing[s] in light of surrounding circumstances, and by determining whether or not the agreement was one which the parties would ordinarily be expected to embody in the writing.”
 
 [178]
 

 The pertinent writings here are a February 7,1986 letter from Margel’s attorney to Tashey,
 
 [179]
 
 Tashey’s February 26, 1986 response,
 
 [180]
 
 and the attorney’s March 4, 1986 reply.
 
 [181]
 
 The February 7 letter, which ultimately was countersigned by Tashey, opened by stating that its purpose was to confirm conversations between Tashey, Margel, and Margel’s attorney and accountant. As indicated previously, it contained no integration clause, certainly an indicator — especially in a document drafted by an attorney — that the document was not intended to express the entire agreement of the parties. But there are other such indications as well. The document did not expressly grant a license to Tashey — rather, it presupposed that the
 
 *304
 
 license had been granted in the prior conversations but went on to confirm that it was limited to the Los Angeles area. Moreover, the letter is instinct with informality. It simply is not the sort of document by which an attorney sets out all of the terms of a simple commercial arrangement, let alone a trademark license.
 
 [182]
 

 These are precisely the factors New York courts look to in determining whether a writing is a complete integration of an agreement. The express reference to the oral agreement among Tashey and Margel is highly pertinent, as is the fact that Tashey was not represented by counsel.
 
 [183]
 
 So too is the fact that this was a relatively simple agreement, the only real complexity of which — the royalty formula — was the chief focus of the letter.
 
 [184]
 
 Thus, the circumstances demonstrate, and the Court finds, that the written sublicense did not fully reflect the parties’ agreement with respect to whether Tashey wpuld hold his operations out
 
 only
 
 under the sublicensed EGL name.
 

 This conclusion is not altered by the 1991 agreement by which Margel and Tashey settled their royalty dispute and extended the term of the sublicense.
 
 [185]
 
 That document acknowledged that Tash-ey’s only right to use the marks “depends on the 1986 sublicense agreement with Margel, as modified by this Agreement.” It thereby incorporated the 1986 agreement by reference, and it made substantive changes only to the duration of the license and the royalties. Accordingly, parol evidence properly is considered in determining the scope of Tashey’s obligations on this point.
 

 Precisely this result may be reached also on an entirely independent ground. The February 7 letter stated,
 
 inter alia,
 
 that Tashey would “have
 
 no
 
 authority to do business in the name or on behalf of European Gemological Laboratory, Inc. or any other corporation of which Mr. Margel was or is a principal”
 
 [186]
 
 — certainly a rather peculiar formulation in a document confirming an agreement to license Tashey to use the name European Gemological Laboratory. As Tashey’s puzzled response
 
 [187]
 
 demonstrates, the document manifestly was ambiguous with respect to the precise role the EGL name was intended to play in Tashey’s business. As parol evidence always is admissible to resolve ambiguity,
 
 [188]
 
 the evidence is considered properly on this basis as well.
 

 As the Court already has found,
 
 [189]
 
 the parol evidence clearly demonstrates that Tashey covenanted to hold his gem grading operations out solely as EGL. All of his efforts to create and promote GQI therefore constituted a material breach of his agreement with Margel that went to the heart of the contract.
 

 2. Competition With EGL
 

 EGL Ltd. claims also that Tashey breached the sublicense by competing with it — grading stones and issuing EGL certificates at trade shows outside Los Angeles, using GQI to compete with EGL (including
 
 *305
 
 Tashey’s Los Angeles EGL laboratory) for colored stone grading business that was done in Los Angeles, and setting up the competitive Chicago operation. But these activities should not be lumped together for analytical purposes.
 

 a. Issuing EGL Certificates Outside Los Angeles.
 

 The sublicense gave Tashey the right to use the EGL name and marks but limited his right to do so to the Los Angeles area. Under the law of New York,
 
 [190]
 
 the Court construes the contract toward the end of realizing the reasonable expectations of the parties.
 
 [191]
 
 In doing so, it looks not only to the literal language, but also to “whatever may be reasonably implied therefrom ....”
 
 [192]
 
 Hence, absent contractual language to the contrary, the contract is construed to embrace “ ‘any promises which a reasonable person in the position of the promisee would be justified in understanding were included.’ ”
 
 [193]
 
 And on this point, there is no room for doubt. By accepting a sublicense that expressly limited the right to use the EGL name and marks to the Los Angeles area, Tashey implicitly covenanted that he would not use the name and marks elsewhere. When he solicited prospective customers to bring stones for grading to his booth at trade shows held outside Los Angeles and there issued EGL certificates on those stones, he flagrantly breached his obligation under the contract.
 

 b. GQI’s Colored Stone Grading.
 

 There are at least two strands to EGL Ltd.’s complaint concerning the GQI colored stone grading. One aspect of the grievance is that Tashey, while the EGL Los Angeles licensee, used GQI to compete for colored stone grading work that otherwise presumably would have been done either by Tashey’s EGL Los Angeles laboratory or by EGL Ltd.’s New York laboratory. In other words, plaintiff asserts that Tashey, as an EGL licensee, should not have engaged in competition with the trademark owner.
 
 [194]
 
 But there is an additional element to EGL Ltd.’s complaint— the fact that Tashey used the EGL trademark to compete against the trademark owner by falsely suggesting that there was an affiliation between the GQI grading operation and the owner of the EGL name and marks. Put a different way, Tashey used EGL’s hard-won customer recognition and trust to gain credibility and acceptance for GQI for the purpose of competing with EGL Ltd.
 

 Plaintiff does not here suggest that a trademark license inherently prevents the
 
 *306
 
 licensee, as a matter of the law of contract, from competing with the trademark owner absent some agreement making competition inappropriate. Nor was there any express agreement stating in so many words that Tashey would not set up another company under another name and use it to grade colored stones. But Tashey did expressly agree to operate his business only under the EGL name. Moreover, he covenanted in the 1991 agreement not to “make any use or reference to any of the [EGL] Trademarks,, or engage in any other conduct, that may impair or tend to impair any of the [EGL] Trademarks or the business reputation and goodwill associated therewith.”
 
 [195]
 

 GQI’s colored stone grading operation ran afoul of these provisions. To begin with, the sublicense was agreed upon in the context of Tashey taking over the operation of the EGL Los Angeles lab and only in that context. When he agreed to carry on his business under the EGL name, the point of the exercise was to keep the worldwide EGL network intact under the EGL name. Moreover, Margel was entitled to a royalty equal to a percentage of Tashey’s gross revenues “earned in connection with such names,”
 
 [196]
 
 a provision that would have been undermined dramatically if Tashey were free to set up a company under a different name and use it to diminish the revenues earned by the EGL operation. Indeed, Tashey effectively recognized as much by refraining from having GQI grade white diamonds, the heart of the EGL business, in Los Angeles. Hence, this alone is sufficient to warrant the conclusion that the GQI colored stone activities breached the agreement, as Tashey used GQI in a manner the purpose and likely effect of which was to deprive Margel of the benefit of his bargain by limiting the revenue stream upon which he depended for his royalties.
 
 [197]
 
 Finally, Tashey’s use of the EGL name to promote GQI and its colored stone grading operation — as, for example, when he misleadingly advertised that “E.G.L.-Los Angeles has created the Gem Quality Institute for your color stone grading needs” or implicitly denigrated EGL’s colored stone services by advertising GQI’s colored stone grading under a headline reading ‘You Have More than One Choice” in an ad that referred also to EGL — certainly were references to the EGL name and marks that threatened to impair the EGL marks and reputation in violation of paragraph 4 of the 1991 agreement.
 
 [198]
 
 They subjected the trademark owner to the risk that any customer dissatisfaction with Tashey’s independent GQI operation would be attributed to the owner in consequence of the false impression of affiliation or sponsorship that Tash-ey deliberately fostered. Accordingly, the Court finds that Tashey’s GQI colored stone grading activities breached the agreement in two respects: they breached his obligation to conduct his grading activities only under the EGL name and, in any case, his use of the EGL name and marks in conjunction with those activities breached paragraph 4 of the 1991 agreement.
 

 c.
 
 The Chicago GQI Operation.
 

 The considerations bearing on the Chicago GQI lab are similar but not entire
 
 *307
 
 ly identical. To be sure, a literal reading of Tashey’s promise to conduct his business exclusively under the EGL name arguably would prohibit the Chicago operation. But in this case, a literal reading would be unduly broad. The business that was within the contemplation of the parties when the sublicense was agreed upon was gem grading in Los Angeles. It is one thing to conclude, as the Court has, that the agreement that Tashey would operate only as EGL prohibited him from competing with EGL in Los Angeles as GQI, particularly where Margel’s royalty income from the sublicense depended upon the gross revenues from the work done under the EGL name. To whatever extent such a prohibition was not expressly agreed upon, it is implied under New York law on the ground that such a promise was one “ ‘which a reasonable person in [Margel’s] position ... would [have] be[en] justified in understanding w[as] included.’ ”
 
 [199]
 
 But Tashey’s agreement to operate in Los An-geles under the EGL name would not have justified Margel in supposing that Tashey would be prohibited from opening another entirely separate gem grading operation under a dissimilar name in a different city absent an express agreement to that effect. Hence, if Tashey had done no more than that, the Chicago operation would not have run afoul of his contract.
 

 Unfortunately for Tashey, he did not simply open an independent operation in Chicago under a dissimilar name. As the Court has found, he first spent several years building up the GQI name as an EGL affiliate and creating a good deal of confusion in the market as to the relationship between the two entities. At times he presented GQI as an entity created by EGL. At others he promoted the impression that EGL was a subsidiary of GQI. Thus, when he opened in Chicago, he did so with the benefit of the impression that his Chicago operation was an EGL affiliate. Accordingly, Tashey’s conduct of a gem grading business in Chicago under the GQI name, given his deliberate promotion of confusion as to the relationship between GQI and EGL for several preceding years, breached his obligation to operate his gem grading business only under the EGL name and to use the EGL name only in Los Angeles.
 

 Tashey’s contention that an exclusive licensee is not in all circumstances barred from competing with its licensor,
 
 [200]
 
 in light of what has been said already, is quite beside the point. The gravamen of Tash-ey’s misconduct in Chicago was his use of the EGL name and marks to gain recognition for the GQI name under which he does business there, not simply the fact that his Chicago operation competes with EGL Ltd. This being the case, Tashey’s actions violated both the Lanham Act, as his clear intent was to confuse customers about the source of the services being provided in Chicago, and his contract with Margel.
 

 IV
 

 The principal relief sought by plaintiff is a permanent injunction barring GQI and the Tasheys from using both the EGL and GQI marks, compensatory and treble damages, and attorney’s fees and costs.
 

 A. Damages
 

 The recovery of damages measured either by the harm to plaintiff or the profits to defendants might well have been appropriate in this case. Moreover, the rules governing the determination of the amount of such damages are generally favorable to plaintiffs.
 
 [201]
 
 Nevertheless,
 
 *308
 
 there has been a complete failure of proof here on the issue of damages. While both sides bear some responsibility for this, there is no basis for relieving plaintiff of the consequences.
 

 To begin with, there was no impediment to plaintiff presenting a damage case based on injury to itself as opposed to defendants’ profits, aside from its own waiver of that remedy. On September 23, 1998, apparently in an effort to avoid discovery of plaintiff by the Tashey defendants, plaintiffs counsel expressly waived any right to a lost profits remedy.
 
 [202]
 

 The matter of defendants’ profits is somewhat more involved. In a letter to the court on January 27, 1999 — after the close of discovery and the submission of the pretrial order and less than three weeks before the trial — plaintiffs counsel complained to the Court that the Tashey defendants had not provided information for the purpose of calculating damages based on their profits, allegedly in violation of an agreement between counsel.
 
 [203]
 
 Defendants responded by claiming that the request for this discovery was untimely.
 
 [204]
 

 The matter arose at the start of the trial. Although plaintiffs request was untimely, the Court ordered that the requested material be produced in view of the Tasheys’ admission that they previously had agreed to do so.
 
 [205]
 
 Nevertheless, plaintiff two days later rested its case without putting in any damage proof or making any further reference to the discovery problem.
 
 [206]
 
 Indeed, plaintiffs counsel in his closing argument made no reference at all to the subject of damages.
 
 [207]
 

 Plaintiffs post-trial memorandum nonetheless urges an award of defendants’ profits and requests an accounting to determine them. It states in part:
 

 “As discussed at trial, EGL LTD. demanded documents necessary to prove Defendants’ revenues on several occasions. Defendants agreed to produce such data, but failed to do so. The Court directed that data relating to profits be produced without further delay. Wfiiile some data relating to reve-núes and Defendants’ anticipated offsets were provided on a confidential basis during settlement discussions, Defendants requested that they be given an opportunity to redact certain material before offering the documents in evidence. Since then, Defendants have agreed to admit the data without redaction. However, more information is still needed.”
 
 [208]
 

 It is not entirely clear from this statement whether plaintiff means that the defendants never produced the documents that the Court ordered produced on the first day of the trial or whether, instead, defendants produced the documents but plaintiff nevertheless needs more information. Whichever is the case, however, this request is without merit. .
 

 Plaintiff never sought the Court’s intervention in obtaining the necessary information prior to the date fixed by the Court’s scheduling orders for the completion of discovery. The issue of damages
 
 *309
 
 was not severed in this case, and the pretrial order specifically placed it in issue. In any case, plaintiff rested and summed up without raising any question as to the Tashey defendants’ compliance with the Court’s production order on the first day of the trial and without any attempt to reserve the issue of damages for later determination.
 

 For the foregoing reasons, the Court declines to award compensatory damages to the plaintiff.
 

 B. Attorney’s Fees and Costs
 

 Section 35(a) of the Trademark Act, as amended,
 
 [209]
 
 permits the court to award attorney’s fees in “exceptional cases.” “Usually, the type of conduct that has sufficed to make out an ‘exceptional case’ is intentional, deliberate or willful infringement.”
 
 [210]
 
 Here, the willfulness of the infringement is clear. In consequence, an award of attorney’s fees is appropriate. The amount shall be fixed on motion pursuant to Rule 54(d)(2).
 

 C. Injunctive Relief
 

 Plaintiff seeks to enjoin the Tashey defendants from any further use of both the EGL and the GQI marks. The theory of the former request is that they have breached and abused the sublicense and used the EGL marks in a confusing way designed to misappropriate EGL’s goodwill for GQI. The theory of the latter is that the GQI mark has become so associated with EGL by virtue of the Tashey defendants’ wrongful conduct that “[t]o allow Defendants to continue to use the GQI marks would perpetuate the harm done to EGL LTD., especially since the only reason the GQI marks have received any recognition is because of their wrongful association with the EGL Marks.”
 
 [211]
 

 The general principles governing equitable relief in trademark cases are plain enough. “The framing of an injunctive decree responsive to the particular facts in a trademark infringement and unfair competition suit is ordinarily within the domain of the trial court.”
 
 [212]
 
 Moreover, “a district court ... may devise a remedy that extends or exceeds the terms of a prior agreement between the parties if it is necessary to make.the injured parties whole.”
 
 [213]
 
 Thus, a court may require an infringer “to keep a safe distance away from the margin line”
 
 [214]
 
 and “proscribe activities that, standing alone, would have been unassailable.”
 
 [215]
 
 Indeed, otherwise unobjectionable conduct may be enjoined if it constitutes “efforts by [the defendant] to retain at least part of the goodwill originally appropriated from” the plaintiff.
 
 [216]
 

 1. The EGL Name and Marks
 

 Tashey’s use of the EGL name and marks was wrongful in that he used them outside Los Angeles and associated them with GQI in a confusing manner. He also breached his agreement with Margel by holding his operation out as EGL Los Angeles rather than simply as EGL. An injunction barring any further such uses manifestly is appropriate. The closer question is whether, as plaintiff contends, Tashey should be barred from all further use of the EGL name and marks.
 

 Tashey has a subsisting sublicense from Margel to use the name and marks in the
 
 *310
 
 Los Angeles area. Proscription of such use would deprive Tashey of the benefit of the sublicense prior to its expiration. It would also deprive Margel of the subli-cense fees that Tashey agreed to pay although that problem could be remedied by conditioning a broader injunction on plaintiffs making Margel whole for the lost revenues. While allowing Tashey to continue using the EGL name and marks in Los Angeles, albeit in conformity with thé terms of the sublicense and without further confusion, does create some risks for plaintiff, Margel’s interests here are dis-positive. Absent Margel’s consent, which has not been sought because he no longer is a party to this case, the Court is not disposed to enjoin such uses of the licensed name and marks as are consistent with the sublicense, although it will fence Tashey in by defining more clearly what is and is not permitted as, for example, by prohibiting the use of any other name and mark in conjunction with the EGL name or marks, defining the Los Angeles area by reference to a specific county or counties, and prohibiting the use of the SI3 grade and references to Tolkowsky cut under the EGL name and marks.
 

 2. The GQI Name and Marks
 

 At this point, Tashey has been misleadingly presenting GQI to the relevant public as the “parent” or “child” of EGL, and in any case as a close affiliate. As noted above, his purpose in doing so has been to gain recognition, acceptance and trust for GQI by virtue of EGL’s preeminent reputation in the gem grading business. Had such activity only just begun, an injunction restraining further such activities would have been sufficient. But it has not. Tashey has engaged in this activity for a number of years. Even if misleading references stopped immediately, the impression of affiliation and sponsorship that he has created would persist — indeed, that was precisely the object Tashey had in mind, given that the entire scheme was driven by his desire to ensure GQI’s success even if the EGL sublicense expired in 2001. He is not entitled to retain that benefit, which was wrongfully acquired at plaintiffs expense.
 

 In some cases, misleading impressions may be dealt with by corrective advertising or product recalls.
 
 [217]
 
 But neither would be satisfactory here. Over the years, Tashey has issued many certificates bearing both the GQI and EGL trademarks which still presumably are in circulation. He has graded hundreds or thousands of stones at trade shows in a booth bearing a GQI sign, yet issued EGL certificates. These certificates cannot be recalled. And while corrective advertising directed to the trade might reach many relevant persons, the text of any such correction would be problematic given that the Tashey-EGL relationship was legitimate in some respects.
 

 Given these difficulties, the only truly effective way of minimizing the extent to which Tashey will profit in the future by his previous wrongful use of the EGL name and marks is to prevent him from using the GQI name, the recognition and acceptance of which is attributable in no small measure to that wrongful use. Accordingly, the Tashey defendants will be enjoined from any further use of the GQI name after a brief transition period.
 

 V
 

 The Court has considered and rejected the parties’ many other contentions. Settle judgment on or before February 14, 2000 on three days notice.
 

 SO ORDERED.
 

 [1]
 

 .
 
 Cf. Bronx Auto Mall, Inc. v. American Honda Motor Co., Inc.,
 
 934 F.Supp. 596, 607-08 (S.D.N.Y.1996),
 
 aff'd on opinion below,
 
 113 F.3d 329 (2d Cir.1997).
 

 [2]
 

 . Pre-Trial Order ("PTO”) at 1 nn.1-2.
 

 [3]
 

 . Ex. 1030 (Krasnianski) at 1.
 

 [4]
 

 . Tr. 145-47, 170-72, 175, 219-23;
 
 see
 
 Ex. 1036 (Tashey) ¶¶ 15-16, 21.
 

 [5]
 

 .
 
 See generally
 
 Tr. 49-56, 159; Exs. 553-54, 565-66, 611, 632 at NY001815-18.
 

 [6]
 

 . Ex. 1031 (Margel) at 1.
 

 [7]
 

 .
 
 Id.
 
 atl.
 

 [8]
 

 .
 
 Id.
 
 at 1-2.
 

 [9]
 

 .
 
 Id.
 
 at 2.
 

 [10]
 

 .
 
 Ex.
 
 1036 (Tashey) ¶¶ 3-5;
 
 see also
 
 Ex. 1031 (Margel) at 3.
 

 [11]
 

 . PTO ¶¶ 9-15. Unless otherwise indicated, this and all subsequent references to the pretrial order are to the stipulated facts, Section III.
 

 [12]
 

 . Ex. 1 (emphasis in original).
 

 [13]
 

 .
 
 See Ex.
 
 1036 (Tashey) ¶ 8.
 

 [14]
 

 . Ex. 2.
 

 [15]
 

 . Ex. 3.
 

 [16]
 

 . Ex. 1.
 

 [17]
 

 . Ex. 1036 (Tashey) ¶ 8.
 

 [18]
 

 . Tr. 187-88, 191; Ex. 1031 (Margel) at 6 (as agreed, Tashey used only the EGL marks until 1994);
 
 see, also
 
 Tr. 264.- To the extent that Tashey suggested at trial that the agreement permitted, but did not require, him to use the EGL name
 
 (id.
 
 264-65), the Court does not credit his testimony.
 

 [19]
 

 . The caveat expressed by Margel’s counsel in substance was merely that Tashey would have no authority to obligate Margel or his corporate entities.
 

 [20]
 

 .
 
 See, e.g.,
 
 Exs. 1031 (Margel) p.5; 1036 (Tashey) ¶ 9.
 

 [21]
 

 . Ex. 1031 (Margel) at 5; Ex. 15.
 

 [22]
 

 . PTO ¶¶ 20, 22; Ex. 15 113.
 

 [23]
 

 . . PTO ¶ 20; Ex. 15 ¶ 4.
 

 [24]
 

 . Ex. 15 ¶ 4.
 

 [25]
 

 . See Tr. 292-94.
 

 [26]
 

 .
 
 Id.
 
 66, 107.
 

 [27]
 

 . Ex. 212.
 

 [28]
 

 . Tr. 66.
 

 [29]
 

 .
 
 See
 
 Tr. 292-94, 351-52.
 

 [30]
 

 . Tr. 294.
 

 [31]
 

 .
 
 Id.
 
 272-73.
 

 [32]
 

 .
 
 Id.
 
 359.
 

 [33]
 

 .
 
 See
 
 Tr. 292-94, 351-52.
 

 [34]
 

 . PTO ¶¶ 24-25.
 

 [35]
 

 . PTO ¶ 23.
 

 [36]
 

 . Ex. 1036 (Tashey) ¶ 15.
 

 [37]
 

 . Tr. 292-94, 351-52.
 

 After admitting the importance of the possible expiration of the EGL license in motivating the formation and development of GQI, Tashey sought to recant and to claim that he expected Margel to renew the license. Tr. 357. That testimony, the Court finds, was false.
 

 In a similar vein, Tashey at another point sought to defend his effort to distinguish his Los Angeles EGL laboratory from other EGL operations as a response to customer pressure motivated by concerns about the quality of work done by other EGL laboratories. Tr. 326-29. Having considered all of the evidence and Tashey’s demeanor, the Court does not credit this testimony either, which it considers to be a fabrication de
 
 *284
 
 signed to put an innocent face on conduct undertaken for quite different reasons.
 

 [38]
 

 . Tr. 355-56;
 
 see also id.
 
 106.
 

 [39]
 

 . Tr. 144, 147-48;
 
 see also id.
 
 269-70.
 

 [40]
 

 .
 
 Id.
 
 269-70.
 

 [41]
 

 . Tashey adapted a color grading system developed by one Munsell for standardizing paint colors and has sought to promote its broad acceptance in the jewelry trade. Tr. 223; Ex. 1036 (Tashey) ¶ 21; Ex. 71. His efforts have not succeeded. Tr. 223.
 

 [42]
 

 . Tr. 284-85, 359-60; PTO ¶¶ 26-28.
 

 [43]
 

 . Ex. 71.
 

 [44]
 

 . Tr. 338-39.
 

 [45]
 

 .
 
 E.g.,
 
 Ex. 57.
 

 [46]
 

 . The evidence on this point is entirely within Tashey’s control, but was not produced at trial.
 

 [47]
 

 .
 
 See
 
 Exs. 29, 30, 38, 57, 192, 640, 689, 692, 1014.
 

 [48]
 

 . Exs. 71 (7/1/95 letter to clients regarding GQI), 509 (undated letter to clients regarding GQI), 677 (8/98 letter to potential Chicago clients).
 

 [49]
 

 . Exs. 678 (10/98 press release discussing GQI Chicago open house), 723 (invitation to the "Tashey Bashey” — a GQI reception held during the May 1997 Las Vegas trade show).
 

 [50]
 

 . Ex. 633; Tr. 298-99.
 

 [51]
 

 . Ex. 192, atNYOOOlO.
 

 [52]
 

 . Tashey claimed at trial that the emphasis he placed on “Los Angeles” was a lesponse to requests from customers, who regarded his laboratory as better than the other EGL laboratories. Ex. 1036 (Tashey) ¶ 18. The Court does not credit that testimony.
 

 [53]
 

 .
 
 See infra
 
 notes 58-62 and accompanying text.
 

 [54]
 

 . Ex. 57.
 

 [55]
 

 . Ex. 692;
 
 see also
 
 Ex. 30, 38, 55, 640.
 

 [56]
 

 . Although they appear to be reprints, only two have been submitted as published advertisements standing alone.
 
 See
 
 Exs. 582, 1005. A third is in evidence as a proof, but not in published form.
 
 See
 
 Ex. 734.
 

 [57]
 

 . Tr. 294-96.
 

 Tashey sought to explain this by asserting that the need for advertising the EGL name declined over time.
 
 Id.
 
 The Court does not credit that explanation. Rather, as industry awareness of GQI and the likelihood of a break between Tashey and EGL both grew, Tashey understandably increased the emphasis on the GQI name in order to build up his own business while giving decreased prominence to EGL, with which he expected to be competing directly upon termination of expiration of his sublicense.
 

 [58]
 

 .
 
 See
 
 Supp. Dep. of Myriam Tashey at 470-71.
 

 [59]
 

 . Ex. 1033 (Gershburg) at 3; Joint Ex. ("JX”) 4 (Karp) at 35-38.
 

 [60]
 

 . Tr. 90-91.
 

 [61]
 

 .
 
 Id.
 
 113.
 

 [62]
 

 .
 
 See
 
 Ex. 728. Indeed, the record is rife with examples of confusion about GQI’s relationship with both EGL-Los Angeles and EGL Ltd., as well as the relationships between the various EGL entities.
 
 See, e.g.,
 
 Ex. 1030 (Krasnianski) at 7, 11, 12; Ex. 1033 (Gersh-burg) at 3; Ex. 192; Ex. 728; Supp. Dep. of Myriam Tashey at 320-21, 470; Supp. Dep. of Craig Slavens at 63, 85-86; Supp. Dep. of Andrea McShane at 47, 50; Supp. Dep. of Tom Shuart at 45,
 
 76;
 
 Supp. Dep. of Martin Guptill at 83; Tr. 90-91; Tr. 112-14; JX 2 (Eitani) at 31, 67-68; JX 3 (Ferrer) at 61-62; JX 6 (Loufek) at 30; JX 8 (Nguyen) at 39, 60, 64, 65; JX 9 (Richman) at 84, 94.
 

 [63]
 

 . PTO ¶¶ 29, 30; Tr. 314-16.
 

 [64]
 

 .
 
 See
 
 Ex. 633.
 

 [65]
 

 . Ex. 1030 (Krasnianski) at 8;
 
 see also
 
 Exs. 37, 54, 63, 630.
 

 [66]
 

 . Ex. 1030 (Krasnianski) at 8; Ex. 251.
 

 [67]
 

 . Ex. 1036 (Tashey) ¶ 25;
 
 see abo
 
 JX 9 (Richman) pp. 50-52.
 

 [68]
 

 . Tashey claimed at one point that he approached Marge] for permission because he thought Margel controlled the marks in the United States. Ex. 1036 (Tashey) ¶ 25. This explanation is inconsistent with his testimony that, he did a trademark search in 1991, learned that Krasnianski controlled the marks here, and insisted on confirmation from Kras-nianski that Margel had the right to sublicense the marks for use in Los Angeles.
 
 Id.
 
 ¶ 10 & Ex. 9;
 
 see also
 
 Tr. 278-79.
 

 [69]
 

 .
 
 See, e.g.,
 
 Ex. 678;
 
 see also
 
 Ex. 1030 (Kras-nianski) at 11.
 

 [70]
 

 . Ex. 1036 (Tashey) ¶ 15.
 

 [71]
 

 . Id. ¶ 25.
 

 [72]
 

 .
 
 See id.
 

 [73]
 

 . Ti. 250-51, 257-58; Ex. 1030 (Krasnian-ski) at 11.
 

 [74]
 

 . Ex. 1032 (Tversky) at 2-3; Exs. 766, 715-17.
 

 [75]
 

 . Ex. 1032 (Tversky) at 2.
 

 [76]
 

 . Ex. 1030 (Krasnianski) at 11-12; Ex. 1032 (Tversky) at 2-3.
 

 [77]
 

 . Ex. 1032 (Tversky) at 3; Ex. 251.
 

 [78]
 

 . Ex. 1032 (Tversky) at 3; Ex. 1030 (Krasni-anski) at 12.
 

 [79]
 

 . Ex. 1036 (Tashey) ¶ 22.
 

 [80]
 

 . See Ex. 251.
 

 [81]
 

 . Ex. 651 ("[D]iamonds graded as SI3 are those which would have normally been graded as a very low SI2, almost II. (SI3 is not, as some would hope, a good looking II.)”)
 

 [82]
 

 . Ex. 1036 (Tashey) ¶ 22 ("Those which were Tow’ SI2’s or high jl’s were placed into this new category.”);
 
 see also
 
 Ex. 1030 (Krasnianski) at 11.
 

 [83]
 

 . Ex. 1032 (Tversky) at 4.
 

 [84]
 

 .
 
 See
 
 Ex. 402.
 

 [85]
 

 . Ex. 1031 (Margel) at 6-7.
 

 [86]
 

 . Exs. 16 (emphasis in original), 402.
 

 [87]
 

 . Ex. 17 ¶ 3.
 

 [88]
 

 . Ex. 17.
 

 [89]
 

 . Tashey testified that Margel mistakenly believed that Tashey’s incorporation of GQI signaled an intention to drop his association with EGL and objected to that. Tr. 289. That testimony is not credible. Margel’s objection was to the use of GQI in association or in competition with EGL. Indeed, Tashey later admitted as much.
 
 Id.
 
 290.
 

 [90]
 

 . Ex. 1031 (Margel) at 7-8.
 

 [91]
 

 .
 
 Id.
 
 7-9;
 
 see also
 
 Tr. 215-18.
 

 [92]
 

 .
 
 See generally
 
 Tr. 64-66, 77-79, 82, 84-86, 90, 96-98, 109, 144, 168-69, 204-05, 213-14.
 

 [93]
 

 .
 
 See id.
 
 167-68.
 

 [94]
 

 . Ex. 1031 (Margel) at 9.
 

 [95]
 

 . Ex. 186;
 
 see also
 
 Ex. 187.
 

 [96]
 

 .
 
 See
 
 Ex. 1031 (Margel) at 9.
 

 [97]
 

 .
 
 Id.
 

 [98]
 

 . Ex. 189, atGM000186.
 

 [99]
 

 . Ex. 1031 (Margel) at 9-10; Tr. 211-12.
 

 [100]
 

 . The laches and unclean hands defenses are patently without merit and require little discussion. While Krasnianski perhaps was slow to sue, he persistently sought to induce Margel — who after all was the source of Tash-ey's rights with respect to the EGL marks — to act. The Court in any case finds no detrimental reliance, an essential element of the defense of laches, by Tashey. The unclean hands defense was unsupported by any persuasive evidence.
 

 [101]
 

 . The Tasheys asserted six counterclaims in their answer: fraud, defamation, unfair competition, trademark infringement, intentional interference with prospective business relations and declaratory relief. Sec. Am. Ans. ¶¶ 24-37. Defendants voluntarily dismissed the claim of defamation. Of the remaining claims, the Tasheys made factual contentions in the pretrial order only with respect to alleged fraud and intentional interference with business relations.
 
 See
 
 PTO, § IV (Parties Contentions), 54 ¶¶ 19-20. But they sought no relief even on these.
 
 See id.
 
 § XVI. Accordingly, the counterclaims, to the extent not voluntarily dismissed, are deemed abandoned.
 
 See Colli v. Wirth,
 
 94 Civ. 3234(LBS), 1996 WL 442835, at *1 (S.D.N.Y. Aug. 6, 1996) ("It is an established procedural principle that a party’s failure to include a legal theory or defense in the pre-trial order results in its subsequent abandonment or waiver.’’).
 

 [102]
 

 . 15 U.S.C. § 1114(1).
 

 [103]
 

 . EGL and European Gemological Institute and the EGL logo, among others, are registered trade- and service marks owned by EGL Ltd. PTO ¶¶ 12-13. The marks of EGL and European Gemological Laboratory are incontestable.
 
 Id.
 
 ¶ 13.
 

 [104]
 

 . 15 U.S.C. § 1125(a).
 

 [105]
 

 .
 
 Arrow Fastener Co., Inc. v. Stanley Works,
 
 59 F.3d 384, 393 n. 6 (2d Cir.1995).
 

 [106]
 

 . PTO ¶ 13.
 

 [107]
 

 .
 
 Chrysler Motors Corp. v. Alloy Automotive Co., Inc., 661
 
 F.Supp. 191, 192-93 (N.D.Ill. 1987);
 
 accord, Professional Golfers Ass’n of Am. v. Bankers Life & Cas. Co.,
 
 514 F.2d 665, 671 (5th Cir.1975).
 

 [108]
 

 . 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969).
 

 [109]
 

 .
 
 Id.
 
 at 668, 89 S.Ct. 1902.
 

 [110]
 

 .
 
 Id.
 
 at 670, 89 S.Ct. 1902.
 

 [111]
 

 .
 
 Beer Nuts, Inc. v. King Nut Co.,
 
 477 F.2d 326, 329 (6th Cir.),
 
 cert. denied,
 
 414 U.S. 858, 94 S.Ct. 66, 38 L.Ed.2d 108 (1973).
 

 [112]
 

 . 2 J. Thomas Mccarthy, Mccarthy On Trademarks And Unfair Competition § 18:63 (4th ed.1999) (hereinafter Mccarthy), at 18-104.1 (citing
 
 Beer Nuts, Inc. v. King Nut Co.,
 
 477 F.2d 326 (6th Cir.),
 
 cert. denied,
 
 414 U.S. 858, 94 S.Ct. 66, 38 L.Ed.2d 108 (1973), and
 
 Danskin, Inc. v. Dan River, Inc.,
 
 498 F.2d 1386 (C.C.P.A.1974));
 
 see also MWS Wire Industries, Inc. v. California Fine Wire Co.,
 
 797 F.2d 799, 803-04 (9th Cir.1986);
 
 Professional Golfers Ass’n of America v. Bankers Life & Cas. Co.,
 
 514 F.2d at 671 (5th Cir.1975);
 
 Heaton Distributing Co. v. Union Tank Car Co.,
 
 387 F.2d 477 (8th Cir.1967);
 
 Donald F. Duncan, Inc. v. Royal Tops Mfg. Co.,
 
 343 F.2d 655 (7th Cir.1965);
 
 E.F. Prichard Co. v. Consumers Brewing Co.,
 
 136 F.2d 512 (6th Cir.1943);
 
 accord,
 
 3 Robert Callman, The Law Of Unfair Competition, Trademarks And Monopolies § 19.48 at 434 (4th ed.1998); Restatement (Third) Unfair Competition § 33
 
 cmt. d,
 
 at 348 (1995).
 

 [113]
 

 . In seeking to avoid the bar of licensee estoppel, Tashey relies on
 
 Ritz Associates, Inc. v. Ritz-Carlton Hotel Co., Inc.,
 
 35 M.2d 425, 230 N.Y.S.2d 408 (1962),
 
 aff'd,
 
 19 A.D.2d 522, 240 N.Y.S.2d 439 (1st Dept.1963), aff
 
 'd,
 
 14 N.Y.2d 670, 249 N.Y.S.2d 873, 198 N.E.2d 905, (1964), where the court held that a naked license is void as a matter of public policy and that any agreement between the parties is not controlling on the license's validity. But the case affords precious little support for Tashey’s position, as the court simply decided the merits of the abandonment issue without even addressing the question whether the licensee was estopped to raise the point.
 

 [114]
 

 . This conclusion makes it unnecessary to determine whether Tashey established abandonment of the marks.
 

 [115]
 

 . 15 U.S.C. § 1114(1)(a).
 

 [116]
 

 .
 
 Id. §
 
 1125(a)(1).
 

 [117]
 

 .
 
 Mushroom Makers, Inc. v. R.G. Barry Corp.,
 
 580 F.2d 44, 47 (2d Cir.1978) (per curiam),
 
 cert. denied,
 
 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979) (§ 1125(a)).
 
 See also Girl Scouts of U.S. v. Bantam Doubleday Dell Publishing Group, Inc.,
 
 808 F.Supp. 1112, 1119 (S.D.N.Y.1992).
 

 [118]
 

 .
 
 E.g., Anheuser-Busch, Inc. v. Balducci Publications,
 
 28 F.3d 769, 774 (8th Cir.1994) (§ 1114(1)),
 
 cert. denied
 
 513 U.S. 1112, 115 S.Ct. 903, 130 L.Ed.2d 787 (1995);
 
 Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,
 
 604 F.2d 200, 204-05 (2d Cir.1979) (§ 1125(a)); 3 McCarthy § 23:8.
 

 [119]
 

 .
 
 Polaroid. Corp. v. Polarad Electronics Corp.,
 
 287 F.2d 492 (2d Cir.),
 
 cert. denied
 
 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).
 

 [120]
 

 . PTO ¶ 13.
 

 [121]
 

 .
 
 See
 
 PTO at 41-42; Tr. 30 (arguing that abandonment of marks by EGL Ltd. would not invalidate them, but relinquish plaintiffs rights in the Los Angeles area to Tashey). Even absent the concession and estoppel, the Court would have no hesitation in finding the marks to be distinctive. Even assuming that all were merely distinctive, the broad publicity given and recognition obtained by them demónstrales secondary meaning.
 

 [122]
 

 . Tashey knew full well that his grading and issuance of EGL certificates at shows outside Los Angeles was not within the scope of the sublicense, and his contrary testimony at trial was false. Indeed, his knowledge of its falsity is evident from his contention that it was appropriate for him to grade stones received by mail or courier from outside Los Angeles because " our agreement permits this,
 
 so long as we do the grading in our LA office.”
 
 Ex. 1036 (Tashey) ¶ 17 (emphasis added).
 

 Tashey argued also that the sublicense merely restricted the place of operation of his business, not the location at which he could grade stones and use the EGL mark. Tr. 260. The argument is frivolous, and Tashey knew it.
 

 [123]
 

 . 4 McCarthy § 25:30, at 25-53.
 

 [124]
 

 .
 
 Id.
 
 § 25:31, at 25-56.
 

 [125]
 

 . This conclusion is consistent with rigorous application of the
 
 Polaroid
 
 factors. For the reasons explained previously,
 
 see supra
 
 note 5, the EGL marks are strong. Tashey was using the EGL marks, so the allegedly infringed and the accused marks were one and the same. The products and services offered under the marks were identical, so there was no gap to bridge. There was some persuasive evidence of actual confusion as is recounted in greater detail below. Tashey, in the Court’s view, clearly acted in bad faith;
 
 *294
 
 his conscious object was to use the EGL name to take business away from EGL Ltd. and to build up his own operation. In some respects, notably in Tashey’s certification of stones as Tolkowsky cuts and his use of the SI3 grade, he offered an inferior product and threatened to bring disrepute on the EGL marks. In all the circumstances, the Court finds that Tashey’s trade show grading activities outside the Los Angeles area were likely to cause confusion. Indeed, Tashey’s bad faith alone is sufficient to warrant the Court’s inference that his actions were likely to cause confusion.
 
 Samara Brothers, Inc., v. Wal-Mart Stores, Inc.,
 
 165 F.3d 120, 127 (2d Cir.1998);
 
 Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc.,
 
 926 F.2d 134, 140 (2d Cir.1991);
 
 Mobil Oil Corp. v. Pegasus Petroleum Corp.,
 
 818 F.2d 254 (2d Cir.1987);
 
 Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.,
 
 909 F.Supp. 896, 908 (S.D.N.Y.1995) (citing
 
 Paddington Corp. v. Attiki Importers and Distributors,
 
 996 F.2d 577, 586 (2d Cir.1993);
 
 Warner Bros., Inc. v. American Broadcasting Cos.,
 
 720 F.2d 231, 246-47 (2d Cir.1983)).
 
 See also
 
 3 McCarthy § 23:110; Restatement (Third) Of Unfair Competition § 22,
 
 cmt. c
 
 ("It is the intent to cause confusion or to deceive that may justify an inference that confusion is likely.”).
 

 [126]
 

 .
 
 See American Footwear Corp. v. General Footwear Co. Ltd.,
 
 609 F.2d 655, 661 (2d Cir.1979). ce
 
 rt. denied
 
 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980); 3 Mccarthy § 23:10, at 23-28.
 

 [127]
 

 .
 
 Mejia and Associates, Inc. v. International Business Machines Corp.,
 
 920 F.Supp. 540, 546 (S.D.N.Y.1996);
 
 see also Banff, Ltd. v. Federated Dep’t Stores, Inc.,
 
 841 F.2d 486, 490 (2d Cir.1988).
 

 [128]
 

 .
 
 See, eg..., supra
 
 notes 47-52, 54, 63-66, 69 and accompanying text.
 

 [129]
 

 .
 
 Supra note
 
 5.
 

 [130]
 

 .
 
 Supra
 
 notes 58-62 and accompanying text.
 

 [131]
 

 .
 
 Supra
 
 note 125.
 

 [132]
 

 . Tr. 294.
 

 [133]
 

 . Tashey sought to maintain at trial that he acted upon advice of counsel and that this negates a finding of bad faith. Def. Post-Trial Mem. 22. The Court disagrees.
 

 First, although Tashey asserted good faith as a defense to wilful infringement and thus placed the substance of his communications in issue and thereby waived the attorney-client privilege,
 
 Brimley v. Hardee's Food Systems, Inc.,
 
 No. 93 Civ. 1797(LAK) , 1995 WL 51177, at *2 (S.D.N.Y. Feb.9, 1995) (citing
 
 United States v. Bilzerian,
 
 926 F.2d 1285, 1292 (2d Cir.),
 
 cert. denied,
 
 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991)), he asserted the attorney-client privilege at his deposition to prevent inquiry into his communications with counsel. Tashey Dep. 574-75. Having blocked his adversary from conducting discovery on this issue, he will not now be heard to advance reliance on counsel.
 

 Second, even if the matter were properly in the case, Tashey’s position is unpersuasive. He claimed to have consulted counsel as to whether he could (1) operate the Los Ange-les office under the name “EGL,” (2) open an EGL office in Chicago, and-(3) use one or more marks in conjunction with the EGL marks. Tr. 310-14, 358-59. But the first two points are of no importance because his right to operate in Los Angeles under the name EGL is undisputed and he never opened in Chicago under the EGL name. Even if Tashey obtained the advice of counsel that he could use another mark in conjunction with the EGL mark, and the Court does not so find, such advice would not have sufficed. As is discussed below, two or more marks of different owners may be used together provided, however, that the separate functions of each are apparent and the joint use is not confusing. There is no persuasive evidence that counsel ever advised Tashey that the joint use of EGL and GQI in the specific circumstances in which Tashey did so was appropriate. Advice on the abstract proposition that two or more marks might be used, if indeed there was any such advice, simply would have been unresponsive to the real issue in this case.
 

 [134]
 

 . 1 McCarthy § 7:8, at 7-10 to 7-11.
 

 [135]
 

 .
 
 E.g., Yard-Man, Inc. v. Getz Exterminators, Inc.,
 
 157 U.S.P.Q. 100, 1968 WL 8094 (1968) (lawn mower identified as "Product of Yard-Man, Inc., Jackson, Michigan for Sears, Roebuck & Co.”); Saul Lefkowitz,
 
 Double Trademarking
 
 — We’ve
 
 Come a Long Way,
 
 73 Trademark Rep. 11, 17-20 (1983) (hereinafter "Lefkowitz”).
 

 [136]
 

 .
 
 Safe-T Pacific Co. v. Nabisco, Inc.,
 
 204 U.S.P.Q. 307, 315, 1979 WL 24888 (1979);
 
 accord,
 
 Lefkowitz, 73 Trademark Rep. at 24-27.
 

 [137]
 

 .
 
 E.g.,
 
 Lefkowitz, 73 Trademark Rep. at 24— 27;
 
 see Franchised Stores of New York, Inc. v. Winter
 
 394 F.2d 664, 668-69 (2d Cir.1968) (licensee liable to trademark owner for affixing licensed mark to unauthorized goods).
 

 [138]
 

 . 523 F.Supp. 619 (S.D.N.Y.1981).
 

 [139]
 

 .
 
 Id.
 
 at 621-22.
 

 [140]
 

 .
 
 Id.
 
 at 623.
 
 Sea also Novo Nordisk of North America, Inc. v. Eli Lilly and Co.,
 
 No. 96 Civ. 5787(BSJ), 1996 WL 497018 (S.D.N.Y. Aug.30, 1996).
 

 [141]
 

 .
 
 Charles of the Ritz Group Ltd. v. Quality King Distributors, Inc.,
 
 832 F.2d 1317, 1324 (2d Cir.1987);
 
 Home Box Office, Inc. v.
 
 Show
 
 time/The Movie Channel, Inc.,
 
 832 F.2d 1311, 1316 (2d Cir.1987).
 

 [142]
 

 . 15 U.S.C. § 1055.
 

 [143]
 

 .
 
 See Mortise v. United. States,
 
 102 F.3d 693, 697 (2d Cir.1996);
 
 Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.,
 
 66 N.Y.2d 38, 44, 495 N.Y.S.2d 1, 4-5, 485 N.E.2d 208 (1985).
 

 [144]
 

 .
 
 Fourth Ocean,
 
 66 N.Y.2d at 45, 495 N.Y.S.2d at 5, 485 N.E.2d 208 (citing
 
 Seaver v. Ransom,
 
 224 N.Y. 233, 239, 120 N.E. 639 (1918);
 
 Matter of Int'l Ry. Co. v. Rann,
 
 224 N.Y. 83, 88, 120 N.E. 153 (1918)).
 

 [145]
 

 .
 
 Id.
 
 (citing
 
 McClare v. Massachusetts Bonding & Ins. Co.,
 
 266 N.Y. 371, 379, 195 N.E. 15 (1935);
 
 Rigney v. New York Cent. & Hudson River R.R. Co., 217
 
 N.Y. 31, 38, 111 N.E. 226 (1916)). The example given in
 
 Fourth Ocean
 
 is a contract which, despite there being no duty between the promisee and the beneficiary, fixes the rate or price at which the beneficiary can obtain services or goods.
 
 Id.
 
 (citing
 
 Pond v. New Rochelle Water Co.,
 
 183 N.Y. 330, 336, 76 N.E. 211 (1906);
 
 Little v. Banks,
 
 85 N.Y. 258 (1881)).
 

 [146]
 

 .
 
 Fourth Ocean,
 
 66 N.Y.2d at 45, 495 N.Y.S.2d at 5, 485 N.E.2d 208 (citations omitted).
 

 [147]
 

 .
 
 See id.
 
 (contract provision benefitting third party by entitling it to goods or services at a stated rate is sufficient to establish an intent to permit enforcement by the third party); Ar
 
 twear, Inc.
 
 v.
 
 Hughes,
 
 202 A.D.2d 76, 83, 615 N.Y.S.2d 689, 693 (1st Dept. 1994) (intent that performance benefit the third party required).
 

 [148]
 

 .
 
 Amoskeag Manufacturing Co. v. D. Trainer & Sons,
 
 101 U.S. 51, 53, 25 L.Ed. 993 (1879).
 

 [149]
 

 .
 
 E.g., Levitt Corp. v. Levitt,
 
 593 F.2d 463, 468 (2d Cir.1979);
 
 Liebowitz v. Elsevier Science Ltd.,
 
 927 F.Supp. 688, 695 (S.D.N.Y. 1996).
 

 [150]
 

 .
 
 Park ’N Fly, Inc. v. Dollar Park and Fly, Inc.,
 
 469 U.S. 189, 198, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985);
 
 Liebowitz,
 
 927 F.Supp. at 695-96.
 

 [151]
 

 .
 
 Federal Exp. Corp. v. Federal Espresso, Inc., 201
 
 F.3d 168 (2d Cir. 2000) (services);
 
 United Drug Co. v. Theodore Rectanus Co.,
 
 248 U.S. 90, 97-98, 39 S.Ct. 48, 63 L.Ed. 141 (1918) (goods);
 
 Liebowitz,
 
 927 F.Supp. at 696 (same).
 

 [152]
 

 .
 
 Liebowitz,
 
 927 F.Supp. at 696;
 
 Capital Temporaries, Inc. of Hartford v. Olsten Corp.,
 
 506 F.2d 658, 663 & n. 2 (2d Cir.1974).
 

 [153]
 

 .
 
 E.g. Liebowitz,
 
 927 F.Supp. at 696.
 

 [154]
 

 . 2 Mccarthy § 18:39.
 

 [155]
 

 .
 
 Dawn Donut Co. v. Hart’s Food Stores, Inc.,
 
 267 F.2d 358, 367 (2d Cir.1959);
 
 Bear USA, Inc. v. Kim,
 
 993 F.Supp. 894, 896 (S.D.N.Y.1998).
 

 [156]
 

 . 2 Mccarthy § 18:46; see 15 U.S.C. § 1055.
 

 [157]
 

 .
 
 E.g., Oberlin v. Marlin Am. Corp.,
 
 596 F.2d 1322, 1327 (7th Cir.1979);
 
 Franchised Stores of N.Y., Inc. v. Winter,
 
 394 F.2d 664, 668 (2d Cir.1968).
 

 [158]
 

 .
 
 E.g., Denison Mattress Factory v. Spring-Air Co.,
 
 308 F.2d 403, 409 (5th Cir.1962);
 
 Cotton Ginny, Ltd. v. Cotton Gin, Inc.,
 
 691 F.Supp. 1347, 1354 (S.D.Fla.1988).
 

 [159]
 

 .
 
 Clayton v. Howard Johnson Franchise Systems, Inc.,
 
 730 F.Supp. 1553, 1560-61 (M.D.Fla.1988).
 

 [160]
 

 .
 
 See, e.g., Buti v. Impressa Perosa, S.R.L.,
 
 139 F.3d 98, 103 (2d Cir.),
 
 cert. denied,
 
 525 U.S. 826, 119 S.Ct 73, 142 L.Ed.2d 57 (1998).
 

 [161]
 

 .
 
 Calzaturificio Rangoni S.p.A. v. U.S. Shoe Corp.,
 
 868 F.Supp. 1414, 1418 (S.D.N.Y.1994) (quoting
 
 Vanity Fair Mills, Inc. v. T. Eaton Co.,
 
 234 F.2d 633, 644 (2d Cir.),
 
 cert. denied.
 
 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956)).
 

 [162]
 

 . Ex. 15 ¶4.
 

 [163]
 

 .
 
 Id.
 

 [164]
 

 . The more extensive the recognition of the EGL "network,” the greater the benefit to all engaged in grading under the EGL name, most notably EGL Ltd., the owner of the EGL marks in the United States. This is because the value of the grading certificate emanates from broad recognition of and trust in the grading organization. A well-recognized and trusted name gives the buyer comfort in the same way that McDonald’s golden arches ease the worries of a hungry but cautious traveler in unknown territory.
 

 [165]
 

 .
 
 See, e.g., Phoenix Racing, Ltd. v. Lebanon Valley Auto Racing Corp.,
 
 53 F.Supp.2d 199, 216 (N.D.N.Y.1999) ("Implicit in all contracts
 
 *302
 
 is a covenant of good faith and fair dealing in the course of contract performance” under which "a party is prohibited from acting in a manner which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.”) (citations and internal quotations omitted);
 
 BGW Development Corp. v. Mount Kisco Lodge No.
 
 1552, 247 A.D.2d 565, 566, 669 N.Y.S.2d 56, 58 (2d Dept.1998).
 

 [166]
 

 .
 
 Septembertide Publishing, B.V. v. Stein and Day, Inc.,
 
 884 F.2d 675, 679 (2d Cir.1989).
 

 [167]
 

 . Restatement (Second) Of Contracts § 302(1) (1979).
 

 [168]
 

 .
 
 Piccoli A/S v. Calvin Klein Jeanswear Co.,
 
 19 F.Supp.2d 157 (S.D.N.Y.1998), upon which Tashey relies, is not to the contrary. The contract there in question contained both non-assignment and inuring clauses demonstrating that the parties intended not to benefit the putative third party beneficiary.
 
 Id.
 
 at 162-64.
 

 [169]
 

 . 394 F.2d 664 (2d Cir.1968).
 

 [170]
 

 .
 
 Id.
 
 at 668-69 (quoting
 
 Dawn Donut Co. v. Hart’s Food Stores, Inc.,
 
 267 F.2d 358, 366 (2d Cir.1959)).
 

 [171]
 

 .
 
 Cf. Septembertide Publishing,
 
 884 F.2d at 679-80.
 

 [172]
 

 .
 
 See Owens v. Haas,
 
 601 F.2d 1242, 1250 (2d Cir.),
 
 cert. denied,
 
 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).
 

 [173]
 

 .
 
 See
 
 Restatement (Second) Of Contracts, § 302 cmt. d.
 

 [174]
 

 . See Ex. 15 ¶ 4.
 

 [175]
 

 .
 
 E.g., Hanley v. Lark Deli Corp.,
 
 2 F.Supp.2d 534, 537 (S.D.N.Y.1998);
 
 Red Rock Commodities, Ltd. v. Standard Chartered Bank,
 
 No. 94 Civ. 8555(LAK), 1997 WL 23179, *3 (S.D.N.Y. Jan.22, 1997),
 
 aff'd,
 
 140 F.3d 420 (2d Cir.1998) (citations omitted):
 
 Marine Midland Bank-Southern v. Thurlow,
 
 53 N.Y.2d 381, 387, 442 N.Y.S.2d 417, 419, 425 N.E.2d 805 (1981).
 

 [176]
 

 .
 
 Fogelson v. Rackfay Const. Co.,
 
 300 N.Y. 334, 337, 90 N.E.2d 881 (1950).
 

 [177]
 

 .
 
 E.g., Adler & Shaykin v. Wachner, 721
 
 F.Supp. 472, 476 (S.D.N.Y.1988).
 

 [178]
 

 .
 
 Braten v. Bankers Trust Co.,
 
 60 N.Y.2d 155, 162, 468 N.Y.S.2d 861, 864, 456 N.E.2d 802 (1983) (quoting
 
 Ball v. Grady,
 
 267 N.Y. 470, 472, 196 N.E. 402 (1935)).
 

 [179]
 

 . Ex. 1.
 

 [180]
 

 . Ex. 2.
 

 [181]
 

 . Ex. 3.
 

 [182]
 

 .
 
 See generally
 
 Richard J. Groos & Timothy M. Kenny,
 
 Fundamental Provisions of Trademark License Agreements,
 
 534 PLI/Pat 149 (1998).
 

 [183]
 

 .
 
 E.g., Adler & Shaykin,
 
 721 F.Supp. at 477;
 
 Manufacturers Hanover Trust Co. v. Mar-golis,
 
 115 A.D.2d 406, 407-08, 496 N.Y.S.2d 36, 37 (1st Dept.1985);
 
 Pecorella v. Greater Buffalo Press, Inc.,
 
 84 A.D.2d 950, 446 N. Y.S.2d 709 (4th Dept.1981).
 

 [184]
 

 .
 
 See Adler & Shaykin,
 
 721 F.Supp. at 477;
 
 Manufacturers Hanover Trust Co.,
 
 115 A.D.2d at 407-08, 496 N.Y.S.2d at 37.
 

 [185]
 

 . Ex. 15.
 

 [186]
 

 . Ex. 1.
 

 [187]
 

 . Ex. 2.
 

 [188]
 

 .
 
 See Starter Corp. v. Converse, Inc.,
 
 170 F.3d 286, 296 (2d Cir.1999);
 
 Trans Pac. Leasing Corp. v. Aero Micronesia, Inc.,
 
 26 F.Supp.2d 698, 706 (S.D.N.Y.1998).
 

 [189]
 

 .
 
 See supra
 
 note 18 and accompanying text.
 

 [190]
 

 . It is unclear where the contract was formed, and it was memorialized in correspondence between Margel’s lawyer in New York and Tashey in California. In the absence of any contention that the law of a jurisdiction other than New York governs and differs from that of New York, the Court proceeds on the assumption that the law of the fpreign jurisdiction accords with that of New York on the subject.
 
 See Stein v. Siegel,
 
 50 A.D.2d 916, 917, 377 N.Y.S.2d 580, 583 (2d Dept.1975) (citing
 
 Read v. Lehigh Valley R.R. Co.,
 
 284 N.Y. 435, 31 N.E.2d 891 (1940)).
 
 See also
 
 Fed. R. Civ P. 44.1;
 
 Bartsch v. Metro-Goldwyn-Mayer, Inc.,
 
 391 F.2d 150, 155 n. 3 (2d Cir.1968) (federal court would not independently investigate German law where parties did not suggest that it differed from New York law);
 
 El Hoss Engineering & Transport Co. v. American Independent Oil Co.,
 
 183 F.Supp. 394, 399 (S.D.N.Y. 1960) (failure to raise question of Kuwaiti law effectively waived rights of either party under Kuwaiti law),
 
 rev’d on other grounds,
 
 289 F.2d 346 (2d Cir.),
 
 cert. denied,
 
 368 U.S. 837, 82 S.Ct. 51, 7 L.Ed.2d 38 (1961).
 

 [191]
 

 .
 
 E.g., Andy Warhol Foundation for the Visual Arts, Inc. v. Federal Ins. Co.,
 
 189 F.3d 208, 215 (2d Cir.1999);
 
 Sutton v. East River Savings Bank,
 
 55 N.Y.2d 550, 555, 450 N.Y.S.2d 460, 463, 435 N.E.2d 1075 (1982); 22 N.Y. Jur2D,
 
 Contracts
 
 § 228, at 279-280 (1996).
 

 [192]
 

 .
 
 Sutton,
 
 55 N.Y.2d at 555, 450 N.Y.S.2d at 463, 435 N.E.2d 1075.
 

 [193]
 

 .
 
 Id.
 
 (quoting
 
 Rowe v. Great Atl. & Pac. Tea Co.,
 
 46 N.Y.2d 62, 69, 412 N.Y.S.2d 827, 831, 385 N.E.2d 566 (1978)).
 

 [194]
 

 . Insofar as the argument depends upon Tashey’s use of GQI to compete for work.
 

 [195]
 

 . Ex. 15 ¶ 4.
 

 [196]
 

 . Ex. 1.
 

 [197]
 

 .
 
 Spanierman Gallery Profit Sharing Plan v. Arnold,
 
 No. 95 Civ. 4468(MBM), 1997 WL 139522, at *3 (S.D.N.Y. Mar.27, 1997) ("Under New York law 'implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance’ ... [that] is breached 'when a party to a contract acts in a manner that ... deprive[s] the other party of the right to receive the benefits under their agreement.’ ") (quoting
 
 Just-Irv Sales Inc. v. Air-Tite Business Center LIC,
 
 237 A.D.2d 793, 794, 655 N.Y.S.2d 131, 132 (3d Dept.1997) (citations omitted)). EGL Ltd. is entitled to rely on this implied obligation in the same manner that it is entitled to rely on Tashey’s other promises to Margel, as the "implied obligation encompasses any promise which a reasonable person in the position of the prom-isee would be justified in understanding was included.”
 
 Just-Irv Sales, Inc.,
 
 237 A.D.2d at 794, 655 N.Y.S.2d at 132.
 

 [198]
 

 . Ex. 15 ¶ 4.
 

 [199]
 

 .
 
 Sutton v. East River Savings Bank,
 
 55 N.Y.2d at 555, 450 N.Y.S.2d at 463, 435 N.E.2d 1075 (quoting
 
 Rowe v. Great Atl. & Pac. Tea Co.,
 
 46 N.Y.2d at 69, 412 N.Y.S.2d at 831, 385 N.E.2d 566).
 

 [200]
 

 . Def. Post-Trial Mem. 16-18.
 

 [201]
 

 . For example, a plaintiff entitled to recover defendant's profits need prove only the defendant’s total revenue. The defendant is obliged to establish that only a smaller sum should be awarded by proving the expenses incurred to produce that revenue.
 
 E.g., Inter
 
 
 *308
 

 national Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,
 
 146 F.3d 66, 71-73 (2d Cir.1998). In much the same vein, uncertainty in proof of the amount of damages caused by the defendant typically is resolved against it.
 
 See, e.g., Bigelow v. RKO Radio Pictures,
 
 327 U.S. 251, 264-65, 66 S.Ct. 574, 90 L.Ed. 652 (1946).
 

 [202]
 

 . Letter, Robert E. Hanlon to Robert Katz, Sept. 23, 1998, at 2 (attached as Exhibit 2 to letter of Robert D. Katz to Court, Jan. 28, 1999).
 

 [203]
 

 . Letter, Robert E. Hanlon to Court, Jan. 27, 1999, at 2.
 

 [204]
 

 . Letter, Robert D. Katz to Court, Jan. 28, 1999, at 2.
 

 [205]
 

 . Tr. 12-13.
 

 [206]
 

 . Tr. 371.
 

 [207]
 

 .
 
 Id.
 
 375-90.
 

 [208]
 

 . PI. Post-Trial Mem. 21.
 

 [209]
 

 . 15 U.S.C. § 1117(a).
 

 [210]
 

 . 5 McCarthy § 30:100, at 30-168 & n. 2 (collecting cases).
 

 [211]
 

 . PL Post-Trial Mem. 18.
 

 [212]
 

 .
 
 Levitt Corp. v. Levitt,
 
 593 F.2d 463, 469 n. 10 (2d Cir.1979).
 

 [213]
 

 .
 
 Id.
 
 at 469.
 

 [214]
 

 .
 
 Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.,
 
 659 F.2d 695, 705 (5th Cir.1981) (quoting
 
 Broderick & Bascom Rope Co. v. Manoff,
 
 41 F.2d 353, 354 (6th Cir.1930)), ce
 
 rt. denied,
 
 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982).
 

 [215]
 

 .
 
 Id.
 
 at 705.
 

 [216]
 

 .
 
 Id.
 
 at 705-06.
 

 [217]
 

 .
 
 See, e.g.,
 
 5 McCarthy §§ 30:6, 30:8.